# EXHIBIT A

DocuSign Envelope ID: 3C30928F-B0F4-4AEB-A4FF-B1E87D74C6B7

# iLoveKickboxing.com

## FRANCHISE AGREEMENT

**For:** BigDog NEST, Incorporated
Benjamin S. Alcid

**TABLE OF CONTENTS**

RECITALS ..... 1

I. DEFINITIONS ..... 1

II. THE FRANCHISED BUSINESS ..... 3

2.1 Our Business. ..... 3
2.2 The Franchise System. ..... 3

III. GRANT OF FRANCHISE ..... 3

3.1 Grant of Franchise ..... 3
3.2 Reserved Rights. ..... 3
3.3 Promotion and Development of Your Outlet. ..... 3
3.4 Extent of Grant. ..... 4
3.5 Electronic Execution and Copies. ..... 4
3.6 Obligations of Entity Franchisee. ..... 4

IV. PAYMENTS BY YOU ..... 4

4.1 Initial Franchise Fee. ..... 4
4.2 Royalty. ..... 5
4.3 Marketing, Advertising and Promotion. ..... 5
4.4 Lead Generation Programs and Other Contests and Promotions. ..... 5
4.5 Electronic Funds Transfer. ..... 5
4.6 Fees Fully Earned; No Setoff on Payments ..... 6
4.7 Late Fee; Interest on Delinquent Payments. ..... 6
4.8 No Accord or Satisfaction. ..... 6

V. INITIAL TERM AND RENEWAL TERMS ..... 6

5.1 Initial Term. ..... 6
5.2 Renewal Terms. ..... 6
5.3 Month to Month Extension; Longer Notice of Expiration Required by Law ..... 7

VI. TRAINING AND ASSISTANCE ..... 8

6.1 Initial Training. ..... 8
6.2 Training and Assistance after Opening ..... 8
6.3 Mandatory Meetings. ..... 9
6.4 Proprietary Materials. ..... 9

VII. OPENING OF OUTLET AND FRANCHISED BUSINESS ..... 9

7.1 Your Outlet ..... 9
7.2 Building Out Your Outlet. ..... 9
7.3 Equipment and Initial Inventory. ..... 11
7.4 Marketing and Advertising Boundaries. ..... 11

VIII. OPERATION OF FRANCHISED BUSINESS ..... 11

8.1 Operational Requirements. ..... 11
8.2 Confidential Operations Manual. ..... 12
8.3 Standards of Operation. ..... 13
8.4 Point of Sale System and Computer System. ..... 13
8.5 Maintenance, Upgrades and Refurbishments to the Outlet. ..... 14
8.6 Relocation of Your Outlet. ..... 14
8.7 Record Keeping and Reporting Requirements. ..... 15
8.8 Signs and Display Materials. ..... 15
8.9 Telephone Numbers ..... 15
8.10 Insurance. ..... 15

8.11 Review and Inspection. .... 16
8.12 Compliance with Laws. .... 16
8.13 Web Site and Internet Marketing. .... 16
8.14 Intranet. .... 17
8.15 Franchise Advisory Council. .... 17

IX. PROPRIETARY MARKS .... 17

9.1 License of the Marks. .... 17
9.2 Your Business Name. .... 18
9.3 Trade Secrets and Proprietary Information. .... 19
9.4 Modification of Marks and Trade Dress. .... 19
9.5 Mark Infringement Claims and Defense of Marks .... 19

X. MARKETING AND PROMOTION .... 20

10.1 Use of Marketing and Promotion Fees. .... 20
10.2 Advertising Content and Costs. .... 20

XI. NON-COMPETITION COVENANTS .... 20

11.1 Exclusive In Term Dealing. .... 20
11.2 Post Termination Non-Competition Covenants. .... 21
11.3 General Provisions regarding Non-Competition Covenants. .... 21

XII. ASSIGNMENT .... 21

12.1 Assignment by Us. .... 21
12.2 Assignment by You. .... 21
12.3 Right of First Refusal. .... 23
12.4 Transfers to Certain Family Members. .... 23
12.5 Transfers to Affiliated Entities. .... 23
12.6 Transfers upon the Death or Incapacity of an Individual Franchisee or Majority Equity Owner. .... 24
12.7 Consent to Transfers. .... 24

XIII. DEFAULT AND TERMINATION .... 24

13.1 General. .... 24
13.2 Immediate Termination. .... 25
13.3 Termination After Notice. .... 26
13.4 Description of Default. .... 26
13.5 Statutory Limitations. .... 26
13.6 Extended Cure Period. .... 27
13.7 Our Right to Cure Your Defaults. .... 27
13.8 Waiver and Delay. .... 27
13.9 Recovery of Lost Royalty. .... 27
13.10 Collection Costs. .... 27
13.11 Continuance of Business Relations. .... 27

XIV. DISPUTE RESOLUTION .... 27

14.1 Mediation. .... 27
14.2 Arbitration. .... 28
14.3 Injunctive Relief. .... 28
14.4 Legal Fees and Expenses. .... 29
14.5 Survival. .... 29

XV. OBLIGATIONS AND RIGHTS UPON TERMINATION OR EXPIRATION .... 29

15.1 Your Obligations. .... 29
15.2 Our Rights as Franchisor. .... 30

XVI. GENERAL TERMS AND PROVISIONS .... 30

16.1 Notices. .... 30
16.2 Indemnity. .... 31
16.3 Your Relationship to Us as Franchisee. .... 31
16.4 No Third Party Beneficiaries. .... 32

16.5 Survival of Covenants. ........ 32
16.6 Successors and Assigns. ........ 32
16.7 Joint and Several Liabilities. ........ 32
16.8 Titles for Convenience Only. ........ 32
16.9 Gender. ........ 32
16.10 Severability; Partial Invalidity. ........ 32
16.11 Counterparts. ........ 32
16.12 Compliance with U.S. Anti-Terrorism and Other U.S. Federal Laws. ........ 32
16.13 Governing Law. ........ 33
16.14 Entire Agreement. ........ 33

XVII. EFFECTIVENESS OF AGREEMENT ........ 33

XVIII. ACKNOWLEDGMENTS AND REPRESENTATIONS ........ 33

18.1 Acknowledgments and Representations. ........ 33
18.2 Additional Information Respecting You and Your Principal Equity Owners. ........ 34

EXHIBIT 1 - TERRITORY AND LOCATION OF OUTLET ........ 37

EXHIBIT 2 - NAMES AND ADDRESSES OF PRINCIPAL EQUITY OWNERS ........ 38

EXHIBIT 3 - STATEMENT OF FRANCHISEE ........ 39

EXHIBIT 4 - ADDENDUM FOR MARYLAND FRANCHISEES ........ 40

# FRANCHISE AGREEMENT

This Franchise Agreement ("Agreement") is made and entered into as of 2/24/2017, 20___ (the "Effective Date"), by and among ILKB LLC, a New York limited liability company, doing business as iLoveKickboxing.com ("ILKB", "we", "us" or "our"), and Benjamin S. Alcid ("you" or "your"), and (if you are not a sole proprietorship) each person owning 20% or more of your entity, who will sign and be a party to this Agreement (in such context, "Principal Equity Owner"), with reference to the following facts:

## RECITALS

An entity affiliated with us (the "Owner of the Marks") owns the iLoveKickboxing.com trademarks, service marks and other intellectual property and all rights in respect thereof. The Owner of the Marks has authorized us to license them to iLoveKickboxing.com franchisees.

You desire to be franchised and licensed by us to use our "System" (as defined in Article I below), "Marks" (as defined in Article I below) and goodwill to conduct the "Franchised Business" (as defined in Article I below) from a specific "Outlet" (as defined in Article I below and identified in Exhibit 1 attached).

We are willing to grant you a "Franchise" (as defined in section 3.1 hereof), in accordance with the provisions of this Agreement and the Confidential Operations Manual.

## I. DEFINITIONS

**Abandoned**. The term "Abandoned" means cessation of operation of the Franchised Business for a period of five consecutive business days, without our prior written consent. A repeated pattern of inactivity at your Outlet for periods of less than five consecutive business days may result in your Franchised Business being deemed Abandoned if in our judgment such inactivity adversely impacts the Franchised Business. However, your Franchised Business will not be deemed Abandoned if the inactivity is due to natural disasters or other matters reasonably beyond your control, provided that you give us notice of any such closure within five business days after the initial occurrence of the event resulting in such inactivity, and we acknowledge in writing that such inactivity is due to one of the foregoing causes, and provided further that you re-establish the Franchised Business and be fully operational within 180 days after the initial occurrence of the event resulting in such inactivity or such longer period as we may permit.

**Anniversary Year**. The term "Anniversary Year" means the 12-month period between the "Opening Date" (as defined below in this Article I) and the first anniversary thereof and between each succeeding anniversary.

**Confidential Operations Manual**. The term "Confidential Operations Manual" means the manual or manuals (regardless of title) containing policies and procedures to be adhered to by you in performing under this Agreement, including all amendments and supplements thereto provided to you from time to time.

**Control**. The term "Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person or entity, whether through the ownership of voting securities, by contract or otherwise.

**Consumer Price Index or CPI**. The term "Consumer Price Index" or "CPI" means the annual average of the Consumer Price Index for All Urban Consumers, published by the Bureau of Labor Statistics of the United States Department of Labor (or the highest similar future index if these figures become unavailable).

**Franchised Business**. The term "Franchised Business" means (i) the providing of kickboxing and other related fitness programs and services to retail customers using designated or authorized iLoveKickboxing.com techniques and formats (ii) the sale to retail customers of "ILKB Services and Products" (as defined below in this Article I), and other services we authorize in the Confidential Operations Manual and (iii) the operation and marketing of an Outlet within the "Territory" (as defined in this Article I), pursuant to our "System" (as defined below in this Article I) and business methods and procedures set forth by us. Franchised Business excludes, and you may not engage in, any martial arts or (except as specifically related to ILKB Services and Products provided at your Outlet) fitness consulting of any kind.

**General Manager**. The term "General Manager" means the individual (may, but is not required to, be a Principal Equity Owner) that has been designated by you as the person responsible for the day-to-day operation of the Outlet, and who has successfully completed Initial Training.

**Gross Revenues**. The term "Gross Revenues" means all revenues, however generated or received, that are derived by you from operating the Franchised Business at or through your Outlet, excluding only applicable sales or use taxes and legitimate refunds, and not modified for uncollected accounts.

**ILKB Services and Products.** The term "ILKB Services and Products" means (i) a variety of kickboxing and other fitness products and accessories supplied by ILKB, designated vendors and approved suppliers for use and resale by you at your Outlet and (ii) other goods and services that we specifically authorize you to offer and sell at your Outlet, in accordance with this Agreement and the Confidential Operations Manual (as amended from time to time by us).

**Initial Training**. The term "Initial Training" means training in the System provided by us, as described in section 6.1 hereof.

**Kickboxing Trainer**. The term "Kickboxing Trainer" means an individual that has been designated by you as a provider of iLoveKickboxing.com training techniques to retail customers and who has successfully completed Initial Training or otherwise been certified by ILKB as a qualified kickboxing trainer.

**Marks.** The term "Marks" means the proprietary marks that are associated with the iLoveKickboxing.com system and associated designs in respect of which registrations have been obtained from or applied for with the United States Patent and Trademark Office, as well as all common law trademarks and service marks, trade names, logos, insignias, designs and other commercial symbols which we now or hereafter are authorized to use and use or authorize others to use to identify the Franchised Business.

**Opening Date**. The term "Opening Date" means the day you open your Outlet, furnished, inventoried and equipped in accordance with our requirements, and you begin operating the Franchised Business at your Outlet.

**Outlet**. The term "Outlet" means a retail kickboxing studio that ILKB has consented to that is exclusively dedicated to the operation of the Franchised Business under the Marks and in accordance with the System. The standard Outlet contains a full complement of kickboxing equipment, accessories and related supplies as well as dressing rooms for the use of retail customers.

**Proprietary Information.** The term "Proprietary Information" means all non-public information, knowledge, know-how and technologies that we designate as confidential, proprietary or trade secrets, including the Confidential Operations Manual, processes, procedures, business formats, business systems, financial information, marketing strategies and programs, operational techniques, service concepts, artwork, e-mail, electronic media, graphics, layouts, slogans, names, titles, text, bulletins, instruction sheets, or supplements thereto, and any proprietary equipment, videotapes, videodiscs, forms, advertising matter, the Marks, devices, insignias and designs.

**System**. The term "System" means comprehensive marketing and operational systems prescribed by us to be used in the conduct of the Franchised Business, as set forth in this Agreement and the Confidential Operations Manual. The System includes (i) the Marks, (ii) know-how relating to ILKB Services and Products, (iii) advertising, marketing and sales programs and techniques, (iv) training programs, and (vi) related materials, artwork, graphics, layouts, slogans, names, titles, text and other intellectual property that we make available to you. In our sole discretion, we may improve or change the System from time to time (including but not limited to adding to, deleting or modifying elements of the System and amending the Confidential Operations Manual) for the intended purpose of making the System more effective, efficient, economical or competitive; adapting to or taking advantage of competitive conditions, opportunities, technology, materials or local marketing needs and conditions; enhancing the reputation or public acceptance of the System; or better serving the public.

**Territory**. The term "Territory" means the designated and agreed geographical area surrounding your Outlet as set forth in Exhibit 1 attached hereto.

**Trade Dress**. The term "Trade Dress" means the unique and distinctive layout, design and color schemes relating to the Outlet, and the textures, sizes, designs, shapes, and placements of words, graphics, and decorations on products and packaging related to ILKB Services and Products.

**Transfer**. The term "Transfer" means a sale, assignment, transfer, conveyance, pledge, mortgage, encumbrance, abandonment, elimination or giving away, voluntarily or involuntarily, by operation of law or otherwise.

## II. THE FRANCHISED BUSINESS

**2.1 Our Business.**
We are engaged in the administration, development, operation and licensing of businesses that operate Outlets offering the Franchised Business, using the Marks, operational techniques, service concepts and proprietary information owned or authorized to be used by and identified with ILKB and our affiliated companies. Our activities in general, and our system (including proprietary products and services; logos; equipment and operations; designs and layouts for the Outlets; marketing and advertising, specialty retail items and promotional activities) are undertaken to develop, maintain and enhance the Marks and our business reputation.

**2.2 The Franchise System.**
As a result of our expenditure of time, skill, effort and money, we have developed and supervise the franchise System under the Marks operated in accordance with the provisions of this Agreement and our Confidential Operations Manual, as amended from time to time.

## III. GRANT OF FRANCHISE

**3.1 Grant of Franchise.**

(a) By our respective signatures below, we hereby grant to you, and you hereby accept, a license ("Franchise") to participate in and use the System by conducting the Franchised Business at your Outlet within your Territory as described in Exhibit 1 attached hereto, in strict accordance with this Agreement and the Confidential Operations Manual, from the time of commencement of the Franchised Business until the end of the term hereof and any additional term unless sooner terminated. So long as you comply with this Agreement, we will not authorize another iLoveKickboxing.com franchisee to operate, or operate ourselves, an Outlet in your Territory.

(b) You acknowledge that we may have granted and may in the future operate or grant other licenses and franchises for kickboxing businesses outside the Territory. YOU MAY NOT USE OUR MARKS, OPERATIONAL TECHNIQUES, SERVICE CONCEPTS OR PROPRIETARY INFORMATION IN CONNECTION WITH ANY BUSINESSES OR SERVICES OTHER THAN THE FRANCHISED BUSINESS AT THE OUTLET WITHOUT THE EXPRESS PRIOR WRITTEN PERMISSION OF ONE OF OUR EXECUTIVE OFFICERS, WHICH PERMISSION, IF GRANTED, WILL BRING SUCH BUSINESSES OR SERVICES WITHIN THE SCOPE OF THE FRANCHISED BUSINESS AND SUBJECT REVENUES THEREFROM TO PAYMENT OF ROYALTY AND MARKETING AND PROMOTION FEES.

**3.2 Reserved Rights.**

(a) Nothing contained herein accords you any right, title or interest in or to the Marks, System, marketing and operational techniques, service concepts, proprietary information or goodwill of ours, except such rights as may be granted hereunder. **THIS AGREEMENT GRANTS YOU ONLY THE RIGHT TO OPERATE THE FRANCHISED BUSINESS AT YOUR OUTLET AND NOWHERE ELSE UNLESS WE SPECIFICALLY ALLOW YOU TO OFFER ILKB SERVICES AND PRODUCTS ELSEWHERE. ALL OTHER RIGHTS ARE RETAINED BY AND RESERVED TO ILKB.**

(b) We reserve the right to develop other systems involving similar or dissimilar services or goods, under dissimilar service marks, trademarks and trade names belonging to us, without necessarily granting you any rights in those systems. We reserve all rights to market and sell ILKB Services and Products at venues other than Outlets and through other channels of distribution anywhere, including within your Territory.

**3.3 Promotion and Development of Your Outlet.**
You must (i) diligently and effectively promote, market and engage in the Franchised Business at your Outlet; (ii) develop, to the best of your ability, the potential for future Franchised Business within your Territory; and (iii) devote and focus a substantial portion of your professional attentions and efforts to such promotion and development.

**3.4 Extent of Grant.**

(a) You understand and agree that you are licensed hereby only for the operation of your Franchised Business at and from your Outlet and only within your Territory (unless we specifically agree otherwise on a case by case basis).

(b) You may not sublicense, sublease, subcontract or enter any management agreement providing for, the right to operate the Franchised Business or to use the System granted pursuant to this Agreement.

**3.5 Electronic Execution and Copies.**

(a) An executed copy of this Agreement (or any portion of this Agreement) may be delivered by any of the parties by facsimile, electrical, digital, magnetic, optical, electromagnetic, or similar capability regardless of the medium of transmission (any such medium is referred to in this and the following section as “electronic”), and such delivery will be effective and binding upon such party, and will not in any way diminish or affect the legal effectiveness, validity or enforceability of this Agreement.

(b) You acknowledge and agree that we may create an electronic record of any or all agreements, correspondence or other communication between us or involving third parties, and those we may thereafter dispose of or destroy the original of any such document or record. Any such electronic record will be inscribed on a tangible medium or stored in an electronic or other medium and be retrievable in perceivable form, and will be maintained in and readable by hardware and software generally available. You agree that, notwithstanding any statute, regulation or other rule of law to the contrary, any such electronic version of this or any other agreement or correspondence between the parties will have the same legal effect, validity and enforceability as an original of any such document, even if the original of such document has been disposed of or intentionally destroyed.

**3.6 Obligations of Entity Franchisee.**

(a) If you are an entity, you must provide us at the Effective Date with a copy of your entity’s organizational document and by-laws, operating agreement or other agreement between the equity owners.

(b) If you are an entity, you must place the following legend on all certificates evidencing an equity interest:

"THE TRANSFER OF THE EQUITY INTEREST IN THE COMPANY REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A FRANCHISE AGREEMENT DATED 2/24/2017, 20 __ BETWEEN THIS COMPANY AND ILKB LLC. REFERENCE IS MADE TO SUCH FRANCHISE AGREEMENT AND THE RESTRICTIVE PROVISIONS CONTAINED THEREIN AND AS MAY BE OTHERWISE SET FORTH IN THE FORMATIONAL AND GOVERNING DOCUMENTS OF THIS COMPANY."

## IV. PAYMENTS BY YOU

**4.1 Initial Franchise Fee.**

(a) If this Agreement relates to a single Outlet transaction, the "Initial Franchise Fee" payable hereunder is $49,999. If this Agreement relates to an Outlet opened under a Multi Outlet Agreement (“MOA”), the Initial Franchise Fee for this Agreement was included in the “Development Fee” you paid under the MOA.

(b) The Initial Franchise Fee for a single Outlet transaction (and all other payments to us for goods or services received from us before your iLoveKickboxing.com location opens for business) is due and payable in full, by cashier’s check or money order or wire transfer to our bank account, when you sign this Agreement. **The Initial Franchise Fee is fully earned by ILKB when paid.**

(c) If before your successful completion of initial training, we decide, in our sole discretion, that you should not operate an iLoveKickboxing.com business, or if you do not obtain our approval to the location of your Outlet within 90 days after the Effective Date (see section 7.2 below), we may cancel this Agreement, without any liability to us, except that we will refund your Initial Franchise Fee less any expenses we incurred relating to this Agreement. **Once your initial Outlet opens for business, the Initial Franchise Fee (or, if applicable, the Development Fee) is not refundable.**

**4.2 Royalty.**

(a) Beginning on the 61st day after the Opening Date, you must pay us a monthly “Royalty” of 6% of the Gross Revenues you receive during each calendar month.

(b) Royalties are due and payable on the third business day following the month in which applicable Gross Revenues were received, and are to be accompanied by a Royalty Fee report (itemizing applicable Gross Revenues) in the form prescribed by ILKB.

**4.3 Marketing, Advertising and Promotion.**

(a) Beginning on the Opening Date, you must pay us a monthly “Marketing and Promotion Fee” of 1% of your monthly Gross Revenues.

(b) Marketing and Promotion are due and payable on a monthly basis on the third business day following the month in which applicable Gross Revenues were received.

(c) Within the first 30 days after the Opening Date, you must spend in your Territory at least $2,000 on the grand opening advertising and promotion of your Outlet, using the grand opening advertising and promotional program that we approve, including the “soft opening” to be held on or about the Opening Date and the Grand Opening event. Not later than 90 days after the Opening Date, you must provide us with a report itemizing your expenditures on the grand opening advertising and promotion of your Outlet.

(d) Commencing on the Opening Date, you must spend at least $30,000 during the initial 12 months thereafter, and then at least $20,000 for each subsequent 12 month period, on the local marketing, advertising and promotion of your Outlet, using marketing and promotional materials pre-approved or otherwise authorized in writing by us ("Local Advertising"). Within five business days after we ask for it, you must report to us all details of your Local Advertising for the previous 30 days.

(e) On a regional or system-wide basis, we may impose an additional assessment upon affected franchisees for special designated advertising or promotional activities if two-thirds of all affected iLoveKickboxing.com franchised outlets agree to such additional assessment by affirmative vote.

(f) With respect to regional or system-wide advertising, including without limitation advertising done as a result of Marketing and Promotion Fee contributions, we determine the cost, form of media, content, format, production, timing (including regional or local concentration and seasonal exposure), location and all other matters relating to advertising, public relations and promotional campaigns.

**4.4 Lead Generation Programs and Other Contests and Promotions.**

(a) You must fully participate with any iLoveKickboxing.com “Lead Generation Program” we set up with a third party promotional company (such as Groupon). We will retain 100% of one-time upfront fees paid by the third party promotional company. You must register each new customer on-line with ILKB and provide him or her with one pair of boxing gloves (at your expense). You may then follow the conversion program outlined in the Confidential Operations Manual to convert a new customer lead, after which you will receive all subsequent revenues generated from that customer.

(b) You must also fully participate with any referral and transformations contests and promotions arranged or authorized by ILKB. Details regarding such contests and promotions will be set forth in the Confidential Operations Manual.

**4.5 Electronic Funds Transfer.**
We require payment of the Royalty and Marketing and Promotion Fees by electronic funds transfer ("EFT") through the Automated Clearing House ("ACH") electronic network for financial transactions, or such other automatic payment mechanism that ILKB may designate directly from your account into our operating account. You must execute or re-execute and deliver to us bank-required pre-authorized check forms and other instruments or drafts to enable us to draw directly from your bank account fees payable under the terms of this Agreement. You must also, in addition to those terms and conditions set forth in the Confidential Operations Manual, maintain a single bank account for such payments (with overdraft protection from your operating account) and must maintain such minimum balance in such account as we may reasonably specify from time to time. You must not alter or close

such account except upon our prior written approval. Any failure of yours to implement such EFT system in strict accordance with our instructions will constitute a material default of this Agreement.

**4.6 Fees Fully Earned; No Setoff on Payments.**

All payments made by you to us under this Agreement are fully earned and non-refundable when paid. All payments to be made by you to us will made be without setoff, deduction, defense, counterclaim or claims in recoupment.

**4.7 Late Fee; Interest on Delinquent Payments.**

(a) Any payment of Royalty and Marketing and Promotion Fees not received by ILKB when due will be delinquent and will be subject to a late payment penalty of 5% of the amount past due.

(b) All delinquent amounts will bear interest from the date payment was due at an annual percentage rate ("APR") of 18% (unless interest rates on delinquent payments in the state in which your Outlet is located are limited by law to a lesser percentage, in which case that APR will apply), and you must reimburse ILKB immediately upon demand for all reasonable costs of collection relating to delinquent amounts.

**4.8 No Accord or Satisfaction.**

If you pay, or we otherwise receive, a lesser amount than the full amount provided for under this Agreement for any payment due hereunder, such payment or receipt will be applied against the earliest amount due us. We may accept any check or payment in any amount without prejudice to our right to recover the balance of the amount due or to pursue any other right or remedy. No endorsement or statement on any check or payment or in any letter accompanying any check or payment or elsewhere will constitute or be construed as an accord or satisfaction.

## V. INITIAL TERM AND RENEWAL TERMS

**5.1 Initial Term.**

The initial term of this Agreement (applicable solely to the Outlet franchised hereunder) commences on the Effective Date and expires of the fifth anniversary of the Opening Date, unless sooner terminated pursuant to the provisions of this Agreement.

**5.2 Renewal Terms.**

(a) You may renew your Franchise relationship for a successor five-year term commencing on the expiration date of the previous term, unless:

(i) You have given us written notice of your intention not to renew this Agreement at least 90 days before the expiration of the initial term or any successor term; or

(ii) We have given you, at least 180 days before the expiration of the initial term or any successor term, written notice of our intention not to renew this Agreement, which must be for one of the following reasons:

(A) You are not in good standing under this Agreement, including your failure to cure any outstanding default for which notice has been given; or

(B) You received from us six or more notices of material default of this Agreement during the entire term that is expiring, or two or more notices of material default during the last 12 months of the term that is expiring.

(b) At the time of renewal, you must (i) then be solvent (which means that you are able to pay your debts as and when promised by you and that you have assets that are greater than your debts), (ii) have not abandoned the Outlet, (iii) not be operating the Franchise in a manner that endangers public health or safety or materially harms the iLoveKickboxing.com brand or reputation, and (iv) not have knowingly submitted false or incomplete reports to us during the initial term.

(c) Notwithstanding section 5.2(a) above, we are not obligated to renew your rights granted under this Agreement for an additional term if one or more of the following applies or occurs:

(i) You give us written notice of your intention not to renew this Agreement at least 180 days before the expiration of the initial term or any successor term.

(ii) During the 180 days prior to expiration of the Franchise, we permit you to sell your Franchised Business to a purchaser meeting our then current requirements for granting new Franchises or (if we are not granting a significant number of new Franchises) the then current requirements for granting renewal Franchises.

(iii) Termination of this Agreement would be permitted pursuant to sections 13.1 or 13.2 hereof.

(iv) You and we agree not to renew the Franchise.

(v) We withdraw from distributing our products or services through Franchises in the geographic market served by you, provided that:

(A) Upon expiration of the Franchise, we agree not to seek to enforce any covenant of the non-renewed franchisee not to compete with us or our franchisees; and

(B) The failure to renew is not for the purpose of converting the business conducted by you pursuant to this Agreement to operation by our employees or agents for our own account.

(vi) At the time of renewal, you or any Principal Equity Owner has been convicted of a felony or a crime involving moral turpitude, consumer fraud or any other offense that is reasonably likely, in our reasonable judgment, to have a materially adverse effect on the Marks, the System, or the goodwill associated with the Marks or System.

(vii) We and you fail to agree to changes or additions to the terms and conditions of this Agreement, if such changes or additions would result in renewal of this Agreement on substantially the same terms and conditions on which we are then customarily granting renewal franchises, or if we are not then granting a significant number of renewal Franchises, the terms and conditions on which we are then customarily granting original franchise agreements. We may give you written notice of a date which is at least 30 days from the date of such notice, on or before which a proposed written agreement of the terms and conditions of the renewal Franchise must be accepted in writing by you. Such notice, when given not less than 180 days before the end of the Franchise term, may state that in the event of failure of such acceptance by you, the notice will be deemed a notice of intention not to renew at the end of the Franchise term.

(d) As a condition to renewing your Franchise rights, not later than 90 days before the end of the term that is expiring, we and you would sign a mutual release and you must then sign either (i) our then-current standard Renewal Franchise Agreement or (ii) an addendum to this Agreement extending its term for an additional five year term. **IN ADDITION TO NOT GRANTING ANY ADDITIONAL RIGHTS BEYOND THOSE GRANTED IN THIS AGREEMENT, THE THEN-CURRENT RENEWAL FRANCHISE AGREEMENT MAY CONTAIN OTHER TERMS THAT ARE SUBSTANTIALLY DIFFERENT FROM THOSE IN THIS AGREEMENT, EXCEPT THE FEES PAYABLE TO US AND THE BOUNDARIES OF THE TERRITORY IN THE RENEWAL FRANCHISE AGREEMENT WILL NOT VARY FROM THE TERMS OF THIS AGREEMENT WITHOUT YOUR CONSENT.** The then-current Renewal Franchise Agreement, when executed, will supersede this Agreement.

(e) At the time of renewal, you must have satisfied all monetary obligations owed by you to us and to our affiliates and all other material obligations under this Agreement.

(f) Before or not later than 90 days after your execution of a Renewal Franchise Agreement for an additional term, you must make such physical modifications to your Outlet as are reasonably necessary so that they are substantially consistent with the then current System requirements, and so that they can accommodate new ILKB Services and Products, if any. You must also bring your Outlet and equipment, materials and supplies into compliance with the standards then applicable to new iLoveKickboxing.com franchises.

(g) When you sign the Renewal Franchise Agreement, we and you would sign a mutual release and you must pay us a “Renewal Fee” of $750. This Renewal Fee is subject to adjustment based on changes in the CPI since the Effective Date.

**5.3 Month to Month Extension; Longer Notice of Expiration Required by Law**.

(a) At our option, if the renewal procedures described in section 5.2 above have not been completed, or in lieu of formal renewal of the Franchise, we may extend this Agreement on a month-to-month basis by notifying you we are doing so. Said month-to-month extension will continue until we give you at least a 30 day notice that the

Franchise rights must be formally renewed in accordance with section 5.2 or the Agreement will expire and be terminated.

(b) If applicable law requires us to give a longer period of notice to you than herein provided prior to the expiration of the initial term or any successor term, we will give such additional required notice. If we do not give such required additional notice, this Agreement will remain in effect on a month-to-month basis only until you have received such required additional notice.

## VI. TRAINING AND ASSISTANCE

**6.1 Initial Training.**

(a) It is of paramount importance that you, your General Manager, your Kickboxing Trainers, the Principal Equity Owners, and your other key employees and representatives understand the Franchised Business and the System, that your General Manager has been trained how to operate the Franchised Business, and that your General Manager and Kickboxing Trainers have been trained how to provide proprietary kickboxing training and techniques to retail customers. Accordingly, we will provide to your General Manager, Kickboxing Trainers and your Principal Equity Owners an Initial Training program, providing an orientation to the System and instruction on how to operate the Franchised Business. Unless there are extenuating circumstances that in our reasonable determination justify a delay, your required trainees must attend the next Initial Training that we offer. Your required trainees must complete Initial Training within 180 days after you sign this Agreement and you may not open and operate your Franchised Business until your General Manager and at least one of your Kickboxing Trainers have satisfactorily completed Initial Training. You acknowledge and agree that ILKB will solely determine whether or not you, your General Manager and your Kickboxing Trainers have satisfactorily completed Initial Training.

(b) The failure of your designated General Manager and at least one of your Kickboxing Trainers to complete Initial Training to our satisfaction will be grounds for termination of this Agreement; provided, however, that your General Manager and Kickboxing Trainer who fails to successfully complete Initial Training will have the opportunity to either retake Initial Training or you may send one replacement, approved by us, to the next available Initial Training program.

(c) We will determine the contents and manner of conducting the Initial Training program in our discretion, however, the training course will be structured to provide practical training in the implementation and operation of the Franchised Business and may include such topics as iLoveKickboxing.com standards, marketing and customer service techniques, reports and equipment maintenance.

(d) There is no separate fee payable to us for the Initial Training program provided to your initial General Manager, one of your Kickboxing Trainers and one of your Principal Equity Owners desiring to attend. You must pay us a fee for each additional attendee of Initial Training as follows: Principal Equity Owners and replacement General Managers - $100; additional Kickboxing Trainers - $200.

(e) All costs and expenses (including travel, hotel and meal) of your attendees of Initial Training will be your sole responsibility. All persons attending Initial Training on your behalf must have a demonstrable relationship to the management and operation of your Franchised Business.

**6.2 Training and Assistance after Opening.**

(a) After you open your Franchised Business, we will provide you with access to the ILKB website, which may include access to a digital copy of the Confidential Operations Manual, as well as workout and marketing videos.

(b) After you open your Franchised Business, we will provide you with access to iLoveKickboxing.com “Mentor Training” (details of which are contained in the Confidential Operations Manual), as well as telephone and e-mail assistance at your request or otherwise as we deem necessary to instruct in all phases of the operation of the Franchised Business. Our field representatives may visit your Outlet and Territory from time to time, but the frequency and duration of any such visits by our representatives is in our sole discretion. In addition, we will be available on an ongoing basis at our national headquarters for consultation and guidance with respect to the operation and management of the Franchised Business.

(c) After you open your Franchised Business, and upon reasonable notice, we may require attendance of your designated personnel at training courses, seminars, conferences or other programs other than Initial Training or mandatory meetings (described in section 6.3 below) that are deemed by us to be relevant or appropriate to the operation of your Franchised Business. You specifically agree that only persons trained by us or under our supervision will have overall responsibility for the operation of the Outlet and Franchised Business, and that you will send your General Manager to us for additional training if we request this.

(d) We may but are not required to make available to you optional staff training courses, coaching and business mentoring programs, seminars, conferences, or other programs, in a suitable location selected by us.

(e) In addition to updates to the Confidential Operations Manual, we may provide you with additional materials relating to the Franchised Business. We may also from time to time make available to you for purchase other materials relevant to the System and the Franchised Business.

(f) All costs and expenses (including travel, hotel and meal) of your attendees at any post-opening training, conferences or meetings will be your sole responsibility. All persons attending post-opening training, conferences or meetings on your behalf must have a demonstrable relationship to the management and operation of your Franchised Business.

(g) In the event of any Transfer of your Franchised Business (which must be done in full compliance with section 12.2 of this Agreement), the transferee must be trained by us as a condition of our consent to such Transfer. The transferred Franchised Business may not be opened or re-opened by the transferee until we accept the transferee in writing as being qualified to operate the Franchised Business and we have otherwise consented to the Transfer in accordance with this Agreement.

**6.3 Mandatory Meetings.**
Not more often than once each year, we may conduct a system-wide meeting or series of regional meetings to discuss iLoveKickboxing.com business activities or other matters relating to the Franchised Business. Attendance of the General Manager at these meetings will be mandatory (and is highly recommended for all of your Principal Equity Owners). You must pay the cost of travel, hotel and meal expenses for your attendees at these mandatory meetings. The mandatory meetings referenced in this section 6.3 are in addition to any voluntary convention or sales conference that may be coordinated by us.

**6.4 Proprietary Materials.**
At Initial Training and other training programs and conferences, we may provide you with confidential and proprietary information ("Proprietary Information"), as well as training materials, training curricula and related materials for your use in the training of your staff. All of these items are and will remain our property. You must not yourself nor allow your employees or others, to copy, reproduce, disseminate or otherwise reveal to third parties any of the foregoing Proprietary Information and related materials without our express prior written consent.

## VII. OPENING OF OUTLET AND FRANCHISED BUSINESS

**7.1 Your Outlet.**
The Franchised Business may only be operated from your Outlet. If your Outlet has not been identified when you sign this Agreement, but the general location of the Territory is identified, the exact location of your Outlet will be inserted into a restated Exhibit 1 attached to this Agreement as soon as its location has been determined. In order to promote the orderly and timely service of iLoveKickboxing.com customers, you may not deliver ILKB Services and Products or other products or services outside your Territory without our prior written consent.

**7.2 Building Out Your Outlet.**

(a) Premises acceptable to ILKB from which your Outlet will be operated must be located and secured by you and reviewed and consented to by ILKB within 180 days after the Effective Date. Within 15 days thereafter we will review and either consent to or disapprove the location (and if we disapprove, you must promptly propose an alternative location). If you have not located a site for your Outlet that is acceptable to ILKB within 120 days after the Effective Date, ILKB may cancel your Franchise Agreement on the basis of your failing to find an acceptable site, without liability to ILKB. You must build out your Outlet (and commence operation of the Franchised Business there) within 180 days after the Effective Date, using architects, project managers, contractors, subcontractors, architectural plans and key equipment suppliers designated by ILKB (or one of our affiliated companies) or otherwise reasonably acceptable to ILKB. You must commence operation of the Franchised Business at your Outlet

as soon as practicable after your receipt of a certificate of occupancy (or equivalent document) from the responsible local government authority. If after you have located and secured suitable premises for your Outlet, you have not commenced operation of the Franchised Business within 180 days after the Effective Date, ILKB may terminate this Agreement effective on written notice, and without liability to ILKB. If this Agreement is for an additional Outlet to be opened under an MOA you executed, you must commence operation of the Franchised Business at the Outlet within the time period specified in the Development Schedule included in the MOA. We will give you an automatic one-month extension to open the Outlet beyond the mandatory dates specified above in this section 7.2(a) if we deem in our sole discretion that you have made a diligent effort to open, but were unable to do so due to reasons beyond your reasonable control.

(b) ILKB will assist you in the site selection process and we reserve the sole right of final review and consent to any location of the Outlet. We may require you use a real estate company designated in the Confidential Operations Manual to assist you in site selection and lease review. ILKB uses available demographic information to help you evaluate the site and the area in which it is located, and analyze area income figures, traffic patterns, visibility, population density, competition, zoning, parking, accessibility and other related, relevant circumstances. Our final review and consent to the location of your Outlet is not a guarantee that an iLoveKickboxing.com business can be successfully operated there or anywhere else.

(c) ILKB will provide you with a sample prototype layout for your Outlet. At your sole expense, you must employ architects, designers, engineers or others designated or approved by ILKB to complete, adapt, modify or substitute the sample plans and specifications for the Outlet. The architect must submit a complete set of final plans and specifications to ILKB before commencing construction of the Outlet. ILKB will review these plans and specifications and accept them as stated, or provide you with our comments on the plans and specifications. ILKB has complete and uncontested control over all design including designating architect, contractors, and other third parties and you may not choose your own contractors, architects or third party designers. And, you may not commence construction of the Outlet until ILKB consents in writing to the final plans, specifications and contractors to be used in constructing the Outlet. ILKB will consult with you, to the extent ILKB deems necessary, on the construction and equipping of the Outlet, but it is and will remain your sole responsibility to diligently construct, equip and otherwise make ready, and then open the Outlet. You are responsible, at your expense, for obtaining all zoning classifications, permits, clearances, certificates of occupancy and center clearances which may be required by governmental authorities.

(d) You must use a general contractor designated by ILKB in the Confidential Operations Manual or other licensed general contractors, designers, vendors and architects approved in writing by ILKB to perform construction work at the Outlet. ILKB expressly disclaims any warranty of the quality or merchantability of any goods or services provided by designated or approved architects, contractors, or any other persons or entities which ILKB may refer to you. ILKB will not be responsible for delays in the construction, equipping or decoration of the Outlet or for any loss resulting from the Outlet design or construction since ILKB has no control over the landlord or developer and numerous construction or related problems which could occur, and consequent delay in the opening of your Outlet. ILKB must approve in writing any and all changes in the Outlet plans prior to construction of the Outlet or the implementation of such changes.

(e) ILKB must have access to your Outlet while work is in progress. We may make video records of construction in process, and may require such reasonable alterations to or modifications in the construction of the Outlet as ILKB deems necessary. Your failure to promptly commence the design, construction, inventorying, equipping and opening of the Outlet with due diligence will be grounds for the termination of this Agreement. And if you do not complete the build out of the Outlet in a reasonable time, ILKB can complete the build out, all expenses of which will then be paid or reimbursed by you. Before opening of the Outlet and prior to final inspections by any governmental agency, representatives of ILKB will complete a final “walk through” inspection of the Outlet and issue a written consent to open. Any deficiencies noted by ILKB as a result of this inspection must be corrected by you within 30 days or this Agreement may be terminated without any liability to ILKB.

(f) Unless otherwise agreed to in writing by you and ILKB, although ILKB will assist you with site selection, you have the sole responsibility for locating and obtaining suitable premises for your Outlet. You and your landlord must execute a rider to your lease or other agreement or written understanding that (i) grants ILKB an option to assume your position as lessee under the lease for the Outlet premises upon 30 days written notice to the Landlord or if you are in material default of either this Agreement or the lease for the Outlet premises (including an obligation of the landlord to notify ILKB within 10 business days if you are in default of your lease), (ii) if ILKB assumes the lease, grants ILKB the option to assign the lease or sublease the Outlet premises to another franchisee, subject to the landlord's consent (which may not be unreasonably withheld), and (iii) requires the landlord to fully cooperate

with ILKB in either allowing ILKB to assume or sublease the Outlet premises or completing de-identification of the Outlet if this Agreement is terminated or expires without being renewed.

(g) ILKB has the right to regularly inspect your Outlet and any other site where you conduct the Franchised Business.

**7.3 Equipment and Initial Inventory.**

(a) Not later than 30 days before the Opening Date, you must order from (and if necessary pre-pay to) designated or approved suppliers the items specified in the "Outlet Development Materials" section of the Confidential Operations Manual the recommended number of pieces of designated kickboxing equipment and other pieces of proprietary equipment and proprietary items necessary for you to provide ILKB Services to your customers, with delivery scheduled for not later than two business days before the Opening Date. Thereafter, you must buy replacement or additional designated kickboxing equipment and other proprietary equipment needed to provide ILKB Services, fitness equipment and accessories, and other authorized items only from vendors designated by ILKB or suppliers approved by ILKB.

(b) You must also purchase non-proprietary fixtures, furnishings, fitness equipment and accessories, POS System, computer hardware, software, modems and peripheral equipment as specified in the "Outlet Development Materials" section of the Confidential Operations Manual, in adequate quantities and sufficiently in advance to allow you to fully operate your Outlet on the Opening Date.

(c) You must buy interior and exterior signs, other materials containing the Marks, and apparel containing the Marks only from suppliers approved by ILKB.

(d) You must also purchase uniforms, supplies, paper goods, services, packaging, forms and other products and supplies to constitute your complete initial inventory of such items as specified in the "Outlet Development Materials" section of the Confidential Operations Manual, with delivery scheduled for not later than three business days before the Opening Date.

**7.4 Marketing and Advertising Boundaries.**

You may not directly promote, advertise or otherwise market your Outlet outside the boundaries of the Territory or other advertising boundary that we designate, except with the express permission of the franchisee in whose territory the advertising is conducted. The marketing and advertising boundaries are determined by us and may be changed by us or overlap with the territories of other iLoveKickboxing.com franchised Outlets as market conditions or type of media warrant, all in our sole discretion. Such marketing and advertising boundaries may exceed the Territory provided herein, in our sole discretion.

## VIII. OPERATION OF FRANCHISED BUSINESS

**8.1 Operational Requirements.**

(a) At all times you must be, or employ, a "full time" General Manager who will devote his or her entire time during normal business hours, as defined in the Confidential Operations Manual, to the management, operation and development of the Franchised Business. The General Manager must ensure that you fulfill your obligations to your customers in a timely and professional manner and he or she may not engage in any other business requiring his or her active participation during normal business hours.

(b) You must only operate the Franchised Business at your Outlet, in strict accordance with the procedures set forth in the Confidential Operations Manual or otherwise provided to you by us in writing. You may only provide ILKB Services and Products to customers who in your reasonable judgment are capable of receiving or using them. You may not engage in the sale or delivery of ILKB Services and Products outside of your Outlet except as we may authorize in the Confidential Operations Manual or otherwise in writing. You must use the standard signs and formats that we prescribe in operating the Outlet and conducting the Franchised Business. To protect and maintain the integrity, reputation and goodwill of the System and the Marks, we require that you comply with the methodology we prescribe in providing ILKB Services and Products to customers. To enhance uniformity in the delivery of goods and services to retail customers by our franchises and the strength of our Marks in inter-brand competition, and subject to applicable antitrust laws, we may recommend retail prices for specific ILKB Services and Products and other products and services we authorize for sale at your Outlet. If we do so, you may not advertise or promote (whether by telephone, printed materials or any other media, including, without limitation, social media) retail prices

that are inconsistent with these recommended prices. Also, to the extent permitted by federal and state law applicable to the Outlet, we may designate maximum and minimum retail prices to be charged for ILKB Services and Products.

(c) Your Franchised Business must be open on a full-time basis in accordance with the hours of operation as designated in the Confidential Operations Manual. The obligation to remain open will not apply in the event of natural or man-made disasters or public emergencies.

(d) You must promptly satisfy any *bona fide* indebtedness that you incur in operating your Franchised Business. Contractors, subcontractors, vendors and suppliers providing services to the Franchised Business must be paid in accordance with the terms of their agreements with you.

(e) You must notify us in writing within 10 days after you receive actual notice of the commencement of any investigation, action, suit, or other proceeding, or the issuance of any order, writ, injunction, award, or other decree of any court, agency, or other governmental authority that pertains to the Franchised Business or that may adversely affect your operations in the Territory or your ability to meet your obligations hereunder.

(f) Upon the occurrence of any event that occurs at the Outlet that has caused or may cause harm or injury to customers or employees, or that may damage the System, Marks, or image or reputation of the Franchised Business or us or our affiliates, you must immediately inform our designated contact person as instructed in the Confidential Operations Manual by telephone, e-mail, text or other electronic messaging medium authorized by us for this purpose. You must cooperate fully with us with respect to our response to an incident described in this section 8.1(f).

(g) If there is any *bona fide* dispute as to any liability for taxes assessed or other indebtedness, you may contest the validity of the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law. However, you may not permit a tax sale or seizure by levy or similar writ or warrant, or attachment by a creditor to occur against the premises of the Franchised Business or any of its improvements.

(h) You may not engage in any co-branding in the Outlet or in connection with the Franchised Business except with our prior written consent. We are not required to approve any co-branding chain or arrangement except in our discretion, and only if we recognize that co-branding chain as an approved co-brand for operation within the System. “Co-branding” includes the operation of an independent business, product line or operating system owned or licensed by another entity (not us) that is featured or incorporated within your Outlet or the Franchised Business you operate in your Territory or is adjacent to your Outlet and operated in a manner which is likely to cause the public to perceive it to be related to the Outlet and Franchised Business licensed and franchised hereunder.

(i) You must not accept cash payments from customers at the Outlet which are not reported to us or incorrectly reported. If this occurs, we can levy a fine of $500 each time it happens and declare you in material default of this Agreement for fraud and subject to immediate termination under section 13.2(a)(ix) of this Agreement.

**8.2 Confidential Operations Manual.**

(a) You must operate the Franchised Business in accordance with the Confidential Operations Manual, a copy of which will be provided to you. You may have access to a digital copy of the Confidential Operations Manual on our website. You may also be provided with a hard copy of all or portions of the Confidential Operations Manual at Initial Training or afterwards. We have the right to modify the Confidential Operations Manual at any time by the addition, deletion or other modification of the provisions thereof. All such additions, deletions or modifications are effective on the next business day after the digital copy maintained on our website is changed.

(b) All additions, deletions or modifications to the Confidential Operations Manual are equally applicable to all similarly situated iLoveKickboxing.com franchisees. As modified by us from time to time, the Confidential Operations Manual will be deemed to be an integral part of this Agreement and references to the Confidential Operations Manual made in this Agreement, or in any amendments or exhibits hereto, are deemed to mean the Confidential Operations Manual. However, the Confidential Operations Manual, as modified or amended by us from time to time, will not alter your fundamental status and rights under this Agreement. If there is any discrepancy or dispute about the version of the Confidential Operations Manual that you may have printed and maintain, the master copy of the Confidential Operations Manual that we maintain at our headquarters and available on our website will be the controlling version and will supersede all prior versions.

**(c) If you lose printed portions of, or allow unauthorized access to or duplication of, the Confidential Operations Manual or any other confidential manuals or proprietary materials loaned to you by us, you may be required to pay us a fine of $1,000 (this amount may be adjusted by changes in the CPI since the Effective Date) within 30 days after our demand for payment, and you will be deemed to be in violation of this Agreement and all other agreements you have with ILKB and our affiliated entities.**

(d) Upon the expiration or termination of this Agreement for any reason whatsoever, you must immediately return to us any printed portions of the Confidential Operations Manual then in your possession. Except as specifically permitted by us, at no time may you, or your employees or agents, (i) make, or cause to be made, any copies or reproductions of all or any portion of the Confidential Operations Manual, (ii) give online access to the Confidential Operations Manual to unauthorized persons, or (iii) disclose any part of the Confidential Operations Manual to any other person except your authorized employees and agents when required in the operation of the Franchised Business. You must also permanently erase anything relating to our trade secrets or other proprietary information from any computers and other media storage devices you retain after expiration, cancellation or termination of this Agreement.

**8.3 Standards of Operation.**

You agree that we, you and everyone else involved in the System benefits from the maintenance of the highest standards of uniformity, quality, similar appearance and prominent display of the Marks at your Outlet and elsewhere in your Territory. Therefore, you agree to maintain the uniform standards of quality, appearance and display of the Marks in strict accordance with this Agreement, the architectural plans and the Confidential Operations Manual as it may be revised from time to time, and as we may otherwise direct in writing. In order that we may establish and maintain an effective network of franchisees, you specifically agree that you must not display the Marks except in the manner we authorize.

**8.4 Point of Sale System and Computer System.**

(a) Within 30 days after we give you written notice to do so, you must purchase, use and maintain the computerized membership scanner and point of sale credit card collection system (including all related hardware and software) as specified in the Confidential Operations Manual or otherwise by ILKB in writing for use in connection with the Outlet (the "POS System"). If applicable, the POS System must be connected at all times to a dedicated, state of the art Internet or other high-speed communications medium specified by ILKB, and be capable of accessing the Internet for the purpose of implementing software, transmitting and receiving data, in the manner designated by ILKB in the Confidential Operations Manual or otherwise by ILKB in writing for maintaining the POS System. You must obtain and maintain an annual maintenance agreement with the manufacturer or distributor of the POS System. The POS System must be electronically linked to ILKB. We may poll the POS System on a daily or other basis at such times and in such manner as determined by ILKB, with or without notice, and to retrieve such transaction information including sales, sales mix, usage and other operations data as ILKB deems appropriate. You must ensure that only adequately trained employees, in our discretion, are allowed to conduct transactions using the POS System. Within a reasonable time upon our request, you must apply for and maintain debit cards, credit cards or other non-cash systems existing or developed in the future to enable customers to access and purchase ILKB Services and Products via such procedure, as specified by us. We may require you to update, upgrade or replace the POS System, including hardware and/or software, from time to time upon written notice, provided that you will not be required to replace the POS System any more frequently than once every three years.

(b) In addition to the POS System, you must purchase, use and maintain a personal computer system (including all related hardware and software) as specified in the Confidential Operations Manual or otherwise by ILKB in writing for use in connection with the Outlet (the "Computer System"). ILKB requires you to maintain an e-mail account and connect the Computer System at all times to a dedicated, state of the art Internet or other high-speed communications medium specified by ILKB, and be capable of accessing the Internet for the purpose of implementing software, transmitting and receiving data, in the manner designated by ILKB in the Confidential Operations Manual or otherwise by ILKB in writing. You must obtain all software and hardware, including digital still and video cameras, as ILKB may specify to enable you to provide ample security against viruses, send and receive e-mail, contact and track customers, perform accounting functions, perform marketing and access and transmit digital photos and streaming video or other multimedia signals and information to and from the Outlet, and you must, from time to time, upon our request transmit digital photos and real time video and audio signals of the Outlet to ILKB, and in the form and manner prescribed by us. You must purchase any upgrades, enhancements or replacements to the Computer System and/or hardware and software as we may from time to time require by 30 days written notice; provided however that you will not be required to update or replace the Computer System any more frequently than once every three years. Upon request, you must permit ILKB to access the Computer System,

details of all classes you are providing at your Outlet and other files and data stored therein via any means specified, including electronic polling communications.

(c) ILKB will designate that certain computer software be used in the operation of the POS System and/or Computer System ("Designated Software"). You must license or sublicense such Designated Software from our designee and enter into a software license agreement on the software licensor's then-current form. ILKB will pay any related license or maintenance fees. From time to time, you must obtain and install upgrades, enhancements or replacements to the Designated Software. You must incorporate any required modifications or additions within 30 days after receiving written notice from ILKB, unless a longer time period is stated in the notice

(d) You may not install, and must prohibit others from installing, unauthorized software on the POS System and the Computer System. You must take all commercially reasonable measures to insure that no virus, Trojan horse, malicious code or other unauthorized code or software is installed on, or transmitted by, the POS System or the Computer System. You must from time to time communicate to ILKB all passwords, access keys and other security devices or systems necessary to permit ILKB to access the POS System and Computer System and obtain the data we are permitted to obtain under this Agreement, including accounting, sales, marketing, client and other information to assist in and support the operation of the Franchised Business. The POS System must also be configured and enabled to send daily and weekly sales reports to the email address provided by ILKB.

(e) ILKB may use information relating to members of your Outlet to market other products and services directly to them.

**<u>8.5 Maintenance, Upgrades and Refurbishments to the Outlet</u>.**

(a) ILKB requires that you maintain, and from time to time refurbish, the Outlet to conform to the then-current building design, Trade Dress, and color schemes then applicable for an Outlet. Such maintenance and refurbishment may require expenditures by you on, among other things, structural changes, installing new equipment, remodeling, redecoration and modifications to existing improvements and such modifications as may be necessary to comply with System-wide standards then in effect for Outlets or to accommodate new ILKB Services and Products. In this regard, the following requirements are applicable:

(i) You must maintain all equipment used at the Outlet on an as needed basis. And you must immediately and completely resolve to our satisfaction any maintenance deficiencies we identify.

(ii) You must make any and all upgrades to equipment and any technology used in your Outlet that we may require.

(iii) We may periodically require you to update the Trade Dress used at your Outlet. Such updates will be contained in the Confidential Operations Manual or otherwise provided to you in writing. Such updates may require you to install new color schemes, logos, signage or other visual elements. We anticipate that such Trade Dress updates will be required no more frequently than once every three years.

(b) ILKB will only require the types of modifications and expenditures described herein where there is good cause. In this context, "good cause" means that ILKB must make a good faith determination that your Outlet is substantially inconsistent with prevailing System-wide standards (or example, either in terms of the Trade Dress, the overall condition of the Outlet, or the type, quality or condition of the equipment needed to adequately prepare, promote and sell ILKB Services and Products) and that, as a result of its appearance or condition, your Outlet is either (i) not adequately positioned to promote and sell ILKB Services and Products as then required or (ii) damaging the integrity of the iLoveKickboxing.com image, brand and/or Marks.

**<u>8.6 Relocation of Your Outlet</u>.**

(a) If you desire to relocate your Outlet, you may do so provided that not less than 90 days prior to the desired date of relocation (unless prior notice is impractical because of a required relocation in which event notice must be given as soon as possible), you make a written request for consent to relocate, describing the reasons for the relocation and providing complete written details respecting any proposed new location.

(b) Within 20 business days after receiving your request, ILKB will either approve or disapprove in writing such closure or relocation in our reasonable discretion. In the event of disapproval of a proposed relocation, you may request an alternative proposed new location pursuant to the provisions of this section 8.6.

(c) You and the landlord may be required to execute a rider to your lease for the new location for the Outlet (or other agreement or written understanding) (i) granting us an option to assume your position as lessee under the lease for the relocated Outlet premises if you are in material default of either (A) the lease for the relocated Outlet premises (including an obligation of the landlord to notify us if you are in such default) or (B) this Agreement, and (ii) requiring the landlord to fully cooperate with us in completing de-identification of the relocated Outlet if this Agreement is terminated or expires without being renewed and we do not exercise our option to assume the lease for the relocated Outlet premises.

**8.7 Record Keeping and Reporting Requirements.**

(a) You agree to implement and thereafter use specific accounting software as may be designated by ILKB to track, account for and report on the financial performance of the Franchised Business. On a monthly basis (not later than 10 business days after the end of each month), you must submit to us financial or statistical reports, records, statements or information as required in the Confidential Operations Manual or otherwise by us in writing.

(b) Within 90 days after the end of each of your fiscal years (or any permitted extension for filing same), you must submit to us a copy of the Schedule C or equivalent portion of your federal tax return relating to the Outlet and your operation of the Franchised Business. On the Effective Date (and any time thereafter that this date changes), you must notify us of your fiscal year end date.

(c) All financial or statistical information you provide to us must be accurate and correct in all material respects.

(d) We have the right to use any financial or statistical information that you provide us, as we deem appropriate. We will not identify you, your Outlet or your Territory as the source of the information, and will not disclose any of this information except (i) with your written consent, (ii) as required by law or compulsory order or (iii) in connection with audits or collections under this Agreement.

(e) We or our designated agents have the right, at all reasonable times, to examine, copy and audit the books, records and applicable portions of your tax returns that relate to the Outlet and your operation of the Franchised Business. We agree to maintain the contents of the Schedules C (or equivalent portion) of your tax returns in strict confidence and will not disclose them to any third party without your express written consent.

(f) You must maintain and preserve all books, records and accounts of or relating to the Franchised Business for at least five years after the close of the fiscal year to which the books records and accounts relate.

**8.8 Signs and Display Materials.**

(a) All signs, display materials and other materials containing the Marks must be in full compliance with the specifications provided in, and in conformity with, the Confidential Operations Manual. We will designate or approve the suppliers of signs and display materials containing the Marks in accordance with Confidential Operations Manual guidelines.

(b) Subject to applicable governmental ordinances, regulations and statutes, you agree to post and maintain, at the Outlet, entirely at your expense, any minimum signage recommended by us. Any signage containing the Marks will be designed by a vendor designated by ILKB and manufactured by a vendor designated or approved by ILKB.

**8.9 Telephone Numbers.**
At your sole expense, you must list the telephone number for your Outlet in accordance with procedures prescribed by the Confidential Operations Manual. At the time of termination or expiration of this Agreement, for any reason, you must transfer the telephone numbers for your Outlet to us or cancel them and de-list them from any applicable telephone directory or other telephone number listing service.

**8.10 Insurance.**

(a) You must have in effect on the Opening Date and maintain during the term of this Agreement comprehensive general liability insurance, automobile insurance, and other insurance that is legally required for you to operate your business (*i.e.*, workers' compensation insurance) or that is reasonably prudent for your type of

business. Policy coverage limitations and other terms relating to insurance will be set forth in the Confidential Operations Manual. Any policies of insurance that you maintain must contain a separate endorsement naming ILKB and the Owner of the Marks (and our other affiliates companies identified by us in writing) as additional insureds to the full extent of coverage provided under the insurance policies. You must provide us a copy of the policy and endorsement upon issuance and upon each and every renewal.

(b) You must promptly notify us of any and all claims against you or us under said policies of insurance and deliver to us certificates evidencing that such insurance are in full force and effect within 30 days after the Opening Date and each succeeding anniversary of the Opening Date. Such insurance certificate must contain a statement that the certificate cannot be canceled without 30 days prior written notice to you and to us. You must notify us in writing immediately regarding any cancellation, non-renewal or reduction in coverage or limits.

**<u>8.11 Review and Inspection</u>.**

(a) ILKB has the right to send representatives at reasonable intervals at any time during normal business hours, to your Outlet or other offices to review and inspect your operations, business methods, service, management and administration relating to the Franchised Business or its equivalent, to determine the quality thereof and the faithfulness of your compliance with the provisions of this Agreement and the Confidential Operations Manual.

(b) You must permit our representatives to access your Outlet and any other facility from which you sell ILKB Services and Products at any time during normal business hours to conduct reviews and inspections. You must cooperate with such reviews and inspections by rendering such assistance as our representatives may reasonably request and upon notice from us or our representatives, immediately begin such steps as may be necessary to correct any deficiencies noted during any such inspection. Within 10 business days after any such inspection, our representatives may re-inspect your Outlet (or other facility, if applicable) to ensure noted deficiencies have been corrected. If the deficiencies have not been corrected by the time of the initial re-inspection, our representatives may make additional re-inspections every five business days thereafter until noted deficiencies have been corrected and you must reimburse the travel and lodging expenses of our representatives who conduct the additional re-inspection.

**<u>8.12 Compliance with Laws</u>.**

You must (i) operate the Franchised Business in compliance with all applicable laws, rules and regulations of all governmental authorities, (ii) comply with all applicable wage, hour and other laws and regulations of the federal, state or local governments, (iii) prepare and file all necessary tax returns and (iv) pay promptly all taxes imposed upon you or upon your business or property. You represent and warrant that you will obtain and at all times maintain all necessary permits, certificates or licenses necessary to conduct the Franchised Business in the locality within which the Outlet is situated. You must immediately notify us of any litigation, arbitration, disciplinary action, criminal proceeding, or any other legal proceeding or action brought against or involving you, or any entity affiliated with you, or any agent, employee, owner, director or partner of yours, which notification must include all relevant details in respect thereof, according to the procedures set forth in the Confidential Operations Manual.

**<u>8.13 Web Site and Internet Marketing</u>.**

(a) During the term of this Agreement, you will use the iLoveKickboxing website as specifically authorized by us in section 6.2(a) of this Agreement, the Confidential Operations Manual or otherwise in writing to register new customers and market your Outlet. Otherwise, you may not (i) engage in Franchised Business directly or indirectly through the Internet, (ii) establish a website or social networking media outlet (such as Facebook, MySpace, Linked In, Twitter, *etc*.), or register an Internet domain or social networking media outlet name using any of the Marks, or (iii) otherwise advertise on the Internet or anywhere else, the mark “iLoveKickboxing.com”, or any other Mark, or any mark similar to “iLoveKickboxing.com”, or any combination or derivations thereof.

(b) Any alternative distribution methods and programs you would like to use to engage in the Franchised Business, including e-commerce, web sites, Internet sub-dealers, telesales and telemarketing, or any other non-retail method of distribution, is subject to the prior written approval of ILKB, which approval will be in our sole discretion.

**8.14 Intranet.**

(a) We may, at our option, establish and maintain an "Intranet" through which iLoveKickboxing.com franchisees may communicate with each other, and through which we and you may communicate with each other and through which we may disseminate the Confidential Operations Manual, updates thereto and other confidential information. We will have discretion and control over all aspects of the Intranet, including the content and functionality thereof. We will have no obligation to maintain the Intranet indefinitely, and may dismantle it at any time without liability to you.

(b) You may use the Intranet, but only if you are in strict compliance with the standards and specifications, protocols and restrictions that we may establish from time to time regarding such use. Such standards and specifications, protocols and restrictions may relate to, among other things, (i) the use of abusive, slanderous or otherwise offensive language in electronic communications, (ii) communications between or among franchisees that endorse or encourage default of any iLoveKickboxing.com franchisee's franchise agreement, or other agreement with us or our affiliates, (iii) confidential treatment of materials that we transmit via the Intranet, (iv) password protocols and other security precautions, including limitations on the number and types of employees that may be granted access to the Intranet, (v) grounds and procedures for our suspending or revoking a franchisee's access to the Intranet, and (vi) a privacy policy governing our access to and use of electronic communications that franchisees post to the Intranet. You acknowledge that, as administrator of the Intranet, we can technically access and view any communication that any person posts on the Intranet. You further acknowledge that the Intranet facility and all communications that are posted to it will become our property, free of any claims of privacy or privilege that you or any other person may assert.

(c) You must establish and continually maintain (during all times that the Intranet is operational and until the termination of this Agreement) an electronic connection (the specifications of which will be specified in the Confidential Operations Manual) with the Intranet that allows us to send messages to and receive messages from you, subject to the standards and specifications.

**8.15 Franchise Advisory Council.**
We may, at our option, establish a franchise advisory council (the "FAC"), which will be composed of franchisees of the System. The FAC will, among other functions requested by us, serve as a representative committee for franchisees of the System and facilitate and coordinate the sharing of information and ideas between franchisees of the System and us. If appointed or elected to do so, you (or your designee) must, at your own expense, participate as a member of the FAC. We reserve the right to set reasonable standards for appointment or election to the FAC and you acknowledge that if we establish the FAC, you may be required to pay a fee or otherwise contribute to the FAC as the FAC leadership or we may require. You acknowledge that the role of the FAC is advisory only, and we are not obligated to implement the FAC's recommendations. Neither you nor your designee will have the right to be appointed, elected, and if appointed or elected, to continue to serve on the FAC if you are in material default of this Agreement, or are not current in your financial obligations to us, and your landlord (if any), suppliers and vendors.

## IX. PROPRIETARY MARKS

**9.1 License of the Marks.**

(a) We hereby grant you the right during the term hereof to use and display the Marks in accordance with the provisions contained in this Agreement and in the Confidential Operations Manual, solely in connection with you operation of the Franchised Business in the Territory. Neither you nor any Principal Equity Owner may use, display or permit the use or display of trademarks, trade names, service marks, insignias or logo types other than the Marks and other trademarks and service marks approved for use by us in connection with the Franchised Business. Neither you nor any Principal Equity Owner may use or display the Marks in connection with the operation of any business or other activity that is outside the scope of the Franchised Business. **You may only use the Marks on the Internet or other electronic media in the manner and as specifically authorized by us in the Confidential Operations Manual or otherwise in writing.** You agree to be responsible for and supervise all of your employees and agents in order to insure the proper use of the Marks in compliance with this Agreement.

(b) You acknowledge that the Marks have been licensed to us by the Owner of the Marks to use in the franchised System. You acknowledge and agree your use of the Marks is a temporary authorized use under this Agreement and that the Owner of the Marks retains all ownership interests in the Marks and that the Owner of the Marks, ILKB and the Owner of the Marks retain all ownership of the goodwill generated by the Marks. You acknowledge that the use of the Marks outside the scope of the terms of this Agreement without our written consent

is an infringement of the Owner of the Marks' and our exclusive rights, title and interest in and to the Marks. You agree that as between you and us, all rights to use the Marks within the franchised System are our exclusive property. You now assert no claim and will hereafter assert no claim to any goodwill, reputation or ownership thereof by virtue of your franchised use thereof or otherwise. It is expressly understood and agreed that ownership and title of the Trade Dress, Confidential Operations Manual and our other manuals, bulletins, instruction sheets, forms, methods of operation and goodwill are and, as between you and us, remains vested solely in us, and the use thereof is only co-extensive with the term of this Agreement.

(c) You agree that during the term of the Franchise, and after the repurchase, expiration or termination of the Franchise, you will not, directly or indirectly, commit an act of infringement or contest or aid others in contesting the validity, distinctiveness, secondary meaning, ownership or enforceability of the Marks or take any other action in derogation of the Marks, and that no monetary amount will be assigned as attributable to any goodwill associated with your use of the System or the Marks.

**(d) You hereby grant us the right at any time to use the name, image and likeness of you and all Principal Equity Owners for commercial purposes in connection with the marketing and promotion of the Marks, ILKB Services and Products, any iLoveKickboxing Outlet, and the System, without compensation. You also agree (i) to have any affected employee of yours who is not a Principal Equity Owner sign a release in the form contained in the Confidential Operations Manual authorizing us to also use his or her name, image and likeness for the purposes described in this section 9.1(d), without compensation, and (ii) to provide us with a copy of such signed release. The terms of this section 9.1(d) survive termination or expiration of this Agreement.**

**[Your Initials:** DS BSA **Principal Equity Owners' Initials: _______ _______ _______ ______ ______ ]**

(e) You acknowledge that we prescribe uniform standards respecting the nature and quality of ILKB Services and Products provided by you in connection with which the Marks are used. Nothing herein gives you any right, title or interest in or to any of the Marks, except a mere privilege and license during the term hereof to display and use the same and you agree that all of your use of the Marks under this Agreement inures to our benefit and the benefit of the Owner of the Marks.

(f) You and all Principal Equity Owners agree that all materials associated with ILKB, ILKB Services and Products or other services, artwork, graphics, layouts, slogans, names, titles, text or similar materials incorporating, or being used in connection with, the Marks which may be created by you, your employees, agents and subcontractors and any other party with whom you may contract to have such materials produced pursuant to this Agreement will become the sole property of the Owner of the Marks, including copyright and trademark rights. In furtherance thereof, you hereby and irrevocably assign to us all such materials, artwork, graphics, layouts, slogans, names, titles, text or similar materials, whether presently or hereafter existing. Furthermore, you agree on behalf of yourself, your employees, your agents, your subcontractors and any other party with whom you may contract to have such materials produced, to promptly execute any and all appropriate documents in this regard.

(g) If necessary, you agree to join with us and share the expenses in any application to enter you as a registered or permitted user, or the like, of the Marks with any appropriate governmental agency or entity. Upon termination of this Agreement for any reason whatsoever, we may immediately apply to cancel your status as a registered or permitted user and you hereby consent to the cancellation and agree to join in any cancellation petition. You will bear the expense of any cancellation petition.

**9.2 Your Business Name.**

(a) In connection with your operation of the Outlet, you agree that at all times and in all advertising, promotions, signs and other display materials, on your letterheads, business forms, and at the Outlet and other authorized business sites, in all of your business dealings related thereto and to the general public, you will identify the Franchised Business solely under a trade name containing the Mark "iLoveKickboxing.com" and authorized by us ("Business Name") together with the words "INDEPENDENTLY OWNED AND OPERATED" on your letterhead, contract agreements, invoices, advertising and other written materials containing the Marks as we may direct.

(b) You must file and keep current a fictitious business name statement, assumed name certificate or similar document with respect to your Business Name in the county or other designated jurisdiction in which you are conducting business and at such other places as may be required by law. Before you commence engaging in the

Franchised Business under the Marks, you must supply evidence satisfactory to us that you have complied with relevant laws regarding the use of fictitious or assumed names.

(c) On expiration or sooner termination of this Agreement, we may, if you do not do so, execute in your name and on your behalf any and all documents necessary, in our judgment, to end and cause a discontinuance of the use by you of the Marks and Business Name registrations and we are hereby irrevocably appointed and designated as your attorney-in-fact to do so.

(d) You further agree that you will not identify yourself as (i) us, (ii) a subsidiary, parent, division, shareholder, partner, agent or employee of ours or the Owner of the Marks or (iii) any of our other franchisees.

(e) If you are an entity and not an individual proprietor, you cannot use any of the Marks in your entity's legal name.

**9.3 Trade Secrets and Proprietary Information.**

(a) You acknowledge that the material and information now and hereafter provided or revealed to you pursuant to this Agreement (including in particular, but without limitation, the contents of the Confidential Operations Manual) are confidential trade secrets of ILKB and are revealed in confidence, and you expressly agree to keep and respect the confidences so reposed, both during the term of this Agreement and thereafter. We expressly reserve all rights with respect to the Marks, confidential trade secrets, methods of operation and other proprietary information, except as may be expressly granted to you hereby or in the Confidential Operations Manual. We will disclose to you certain of our trade secrets as reasonably needed for the operation by you of your Franchised Business by loaning to you, for the term of this Agreement, the Confidential Operations Manual and other written materials containing the trade secrets, through training and assistance provided to you hereunder, and by and through the performance of our other obligations under this Agreement.

(b) You acknowledge that we are the sole owner of all Proprietary Information and our trade secrets; that such information is being imparted to you only by reason of your special status as a franchisee of the System; and that our trade secrets are not generally known to our industry or the public at large and are not known to you except by reason of such disclosure. You further acknowledge that you will acquire no interest in the Proprietary Information and trade secrets disclosed to you, other than the right to use them in the development and operation of the Franchised Business during the term of this Agreement. In addition, you acknowledge that the use or duplication of our trade secrets except as expressly permitted by this Agreement constitutes an unfair method of competition and that we will suffer irreparable injury thereby.

(c) You agree that you will not do or permit any act or thing to be done in derogation of any of our rights in connection with the Marks, either during the term of this Agreement or thereafter, and that you will use these only for the uses and in the manner franchised and licensed hereunder and as herein provided. Furthermore, you and your employees and agents will not engage in any act or conduct that impairs the goodwill associated with the Marks.

**9.4 Modification of Marks and Trade Dress.**
We may add to, substitute or modify any or all of the Marks or Trade Dress from time to time, by directive in the Confidential Operations Manual. You must accept, use, display, or cease using, as may be applicable, the Marks and Trade Dress, including but not limited to, any such modified or additional trade names, trademarks, service marks, logo types and commercial symbols, and must within 30 days of receiving notification, commence to implement such changes and use your best efforts to complete such changes as soon as practicable.

**9.5 Mark Infringement Claims and Defense of Marks**.

(a) If you receive notice or otherwise become aware of any claim, suit or demand against you by any party other than us, the Owner of the Marks or any of our affiliates on account of any alleged infringement, unfair competition or similar matter arising from your use of the Marks in accordance with the terms of this Agreement, or any misuse of the Marks by third parties on the Internet or otherwise, you must promptly notify us of any such claim, suit, demand or misuse. You will have no power, right or authority to settle or compromise any such claim, suit or demand by a third party or to intervene to stop misuse, without our prior written consent. We will defend, compromise or settle at our discretion any such claim, suit or demand and take steps to stop misuse at our cost and expense, using attorneys selected by us or the Owner of the Marks, and you agree to cooperate fully in such matters.

(b) We will indemnify you and hold you harmless from and against any and all judgments resulting from any claim, suit or demand arising from your authorized and proper use of the Marks in accordance with the terms of this Agreement. We have the sole discretion to determine whether a similar trademark or service mark that is being used by a third party is confusingly similar to the Marks being used by you or constitutes a misuse of the Marks, and whether and what subsequent action, if any, should be undertaken with respect to such similar trademark or service mark or misuse.

## X. MARKETING AND PROMOTION

**10.1 Use of Marketing and Promotion Fees.**

(a) If and when we begin collecting Marketing and Promotion Fees pursuant to section 4.3(a) hereof, ILKB will expend, for the purposes of national, regional or local marketing, advertising, cooperative advertising, market research, public relations and promotional campaigns designed to promote and enhance the value of the Marks and general public recognition and acceptance thereof, an amount equal to the aggregate Marketing and Promotion Fees stated in section 4.3 hereof and collected from all of its franchisees less a 15% administrative fee. No interest on unexpended Marketing and Promotion Fees will be imputed for your benefit or payable to you. If requested by you in writing not later than March 31 of any calendar year, we will provide you not later than May 31 of that year with a statement of receipts and expenditures of the aggregate Marketing and Promotion Fees relating to the preceding calendar year, certified to be correct by an officer of ILKB.

(b) In our sole discretion and as we deem appropriate, ILKB would be obligated to spend the Marketing and Promotion Fees collected from you and all other iLoveKickboxing.com franchisees (less our 15% administrative fee) on regional, local or national media or other marketing techniques or programs designated to promote the retail sale of ILKB Services and Products, the Marks and other aspects of the iLoveKickboxing.com brand, creative and production costs, and for other purposes deemed appropriate by us to enhance and promote the general recognition of iLoveKickboxing.com franchises.

(c) ILKB would also be authorized to spend Marketing and Promotion Fees collected from you and all other iLoveKickboxing.com franchisees for ILKB-approved initiatives, which may include branding and marketing studies, initiatives and research; test marketing new products or concepts; the development of marketing strategies, tools, initiatives, and materials; public relations; market research; annual conferences (excluding the expenses of our principals and employees to travel to such conferences); and occasional selective regional and local advertising.

**10.2 Advertising Content and Costs.**
With respect to local, regional or system-wide advertising, we determine the cost, form of media, content, format, production, timing (including regional or local concentration and seasonal exposure), location and all other matters relating to advertising, public relations and promotional campaigns.

## XI. NON-COMPETITION COVENANTS

**11.1 Exclusive In Term Dealing.**

(a) You acknowledge that you will receive valuable specialized training and access to our trade secrets, including, without limitation, information regarding the operational, sales, promotional and marketing methods and techniques of the System. In consideration for the use and license of such valuable information, you agree that you will not during the term of this Agreement operate, manage, own, assist or hold an interest in (direct or indirect as an employee, officer, director, shareowner, partner or otherwise), or engage in, any competing business selling goods or offering services equivalent to ILKB Services and Products or the Franchised Business, without our express prior written consent.

(b) It is the intention of both you and ILKB that you maximize the Franchised Business within the Territory, and any action of yours that diverts business to another entity or diminishes the Franchised Business being conducted in the Territory will be a material breach of this Agreement. Accordingly, neither you nor any Principal Equity Owner may, either directly or indirectly, for yourself or themselves, or through, on behalf of, or in conjunction with, any person, persons, partnership, corporation or other entity, (i) divert or attempt to divert any business or customer of the Franchised Business to any competitor, by direct or indirect inducement or otherwise, (ii) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System, or (iii) solicit without our prior consent any person who is at that time employed by us or any related entity to leave his or her employment.

**11.2 Post Termination Non-Competition Covenants.**

For a period of 18 months after termination of this Agreement or its expiration without renewal pursuant to section 5.2 of this Agreement, you agree that neither you nor any Principal Equity Owner may (either directly or indirectly, for yourself or themselves, or through, on behalf of, or in conjunction with, any person, persons, partnership, corporation or other entity) operate, manage, own, assist or hold an interest in (direct or indirect as an employee, officer, director, shareowner, partner or otherwise), or engage in, any competing business selling goods or offering services equivalent to ILKB Services and Products or the Franchised Business, within a radius of 25 miles of your Outlet or any other authorized retail location selling ILKB Services and Products, without our express prior written consent. In all events, at all times following termination or expiration of this Agreement, you must refrain from any use, direct or indirect, of any of our proprietary information.

**11.3 General Provisions regarding Non-Competition Covenants.**

(a) You acknowledge that the restrictions contained in this Article XI are reasonable and necessary in order to protect our legitimate interests, and in the event of violation of any of these restrictions, we are entitled to recover damages including, without limitation, (i) Royalties, Marketing and Promotion Fees, (ii) amounts due from Web Specials, Groupon, Merchandise, MA Power Listings and Yelp, and (iii) other fees that would have been payable if such business were included in the Franchised Business. You must also provide us with an equitable accounting of all earnings, profits and other benefits arising from such violation, which rights and remedies will be cumulative and in addition to any other rights or remedies to which we are entitled at law or in equity.

(b) This Article XI applies to your General Manager and other Principal Equity Owners, and each of your other managers, directors, officers, general partners and affiliates.

(c) Each provision of this Article XI is independent of each other provision of this Agreement. If any provision of this Article XI is held unreasonable or unenforceable by any court, agency or other tribunal of competent jurisdiction, you agree to be bound by the maximum duty permitted by law with respect to that provision, which will be deemed restated accordingly, and also agree to be bound by all other provisions of this Article XI.

## XII. ASSIGNMENT

**12.1 Assignment by Us.**

We have the right to Transfer this Agreement, and all of our rights and privileges hereunder to any other person, firm or corporation ("Our Assignee"); provided that, in respect to any Transfer ("Assignment by Us") resulting in the subsequent performance by Our Assignee of the functions of franchisor hereunder: (i) at the time of Assignment by Us, Our Assignee must be financially responsible and economically capable of performing the obligations of franchisor hereunder; and (ii) Our Assignee must expressly assume and agree to perform such obligations. If there is an Assignment by Us, we will be relieved of all obligations or liabilities after the effective date of the assignment.

**12.2 Assignment by You.**

(a) This Agreement is being entered into in reliance upon and in consideration of the singular personal skills and qualifications of you and the Principal Equity Owners and the trust and confidence we repose in you and them. Therefore, neither your interest in this Agreement and the Franchise granted hereunder, nor all or substantially all of the assets of the Franchised Business, nor a controlling or non-controlling interest in the Franchised Business, may be assigned, transferred, shared or divided, voluntarily or involuntarily, in whole or in part, by operation of law or otherwise, in any manner (collectively, "Assignment by You"), without our prior written consent and subject to our right of first refusal provided for in section 12.3 hereof. Our consent to a specific Assignment by You is not cumulative and will not apply to any subsequent assignments, in respect of each of which you must comply with this section 12.2.

(b) Prior to any Assignment by You, you must notify us of your intent to sell, transfer or assign the Franchise, all or substantially all of the assets of the Franchised Business, or a controlling or non-controlling interest in the Franchised Business. The notice shall be in writing, delivered to us in accordance with section 16.1 hereof and include all of the following:

(i) The proposed transferee's name and address;

(ii) A copy of all agreements related to the sale, assignment, or transfer of the Franchise, the assets of the Franchised Business, or the interest in the Franchised Business; and

(iii) The proposed transferee's application for approval to become the successor franchisee. The application must include all forms, financial disclosures and related information generally utilized by us when interviewing prospective new franchisees, if those forms are readily made available to you. If the forms are not readily available, you must request that we deliver the forms to you by business courier in accordance with section 16.1 hereof within 15 calendar days. As soon as practicable after the receipt of the proposed transferee's application, we will notify, in writing, you and the proposed transferee of any additional information or documentation necessary to complete the transfer application. If our then-existing standards for the approval of new or renewing franchisees are not readily available to you when you notify us of your intent to sell, transfer, or assign the Franchise, all or substantially all of the assets of the Franchised Business, or the controlling or non-controlling interest in the Franchised Business, we will communicate the standards to you within 15 calendar days.

(c) Within 60 days after the receipt of all of the necessary information and documentation required pursuant to section 12.2(b) above, or as specified by written agreement between us and you, we will notify you of the approval or disapproval of the proposed Assignment by You. The notice will be in writing and delivered to you by business courier in accordance with section 16.1 hereof. Should we elect not to exercise our right of first refusal, or should such right of first refusal be inapplicable, as herein provided, our consent to the proposed Assignment by You will be deemed approved, unless disapproved by us in writing and for reasons permitted by the law governing this Agreement. If the proposed sale, assignment or transfer is disapproved, we will include in the notice of disapproval a statement setting forth the reasons for the disapproval. We may impose, among other things, the following conditions precedent to our consent to any such Assignment by You (these conditions are consistently applied to similarly situated franchisees operating under the Franchise brand):

(i) The assignee of yours ("Your Assignee") must complete our application for a franchise, and in connection therewith, you and Your Assignee must fully disclose in writing all of the terms and conditions of the Assignment by You;

(ii) Your Assignee and the principal equity owners of Your Assignee demonstrate they have the skills, qualifications and economic resources necessary, in our sole judgment, to conduct the business contemplated by this Agreement;

(iii) Your Assignee and each principal equity owner of Your Assignee expressly assumes in writing for our benefit all of your obligations under this Agreement;

(iv) Your Assignee executes the then current form of Franchise Agreement being used by us for the remainder of the term of this Agreement or, in our sole discretion, for the initial term of the then current form of Franchise Agreement (unless we have a reasonable basis not to allow this, you may elect to have Your Assignee assume this Agreement for the remainder of its term);

(v) You must have complied fully as of the date of any such Assignment by You with all of your material obligations to us, whether under this Agreement or any other agreement, arrangement or understanding with us;

(vi) Your Assignee agrees that our Initial Training program described in section 6.1 hereof and any other training or orientation programs then required by us will be satisfactorily completed by necessary personnel within 30 days after the execution by Your Assignee of a Successor Franchise Agreement, provided, however, that Your Assignee must agree to pay for all of his, her or its expenses incurred in connection therewith, including any fee we charge for training (at the rate in effect at the time of transfer), travel, hotel and meal expenses; and

(vii) Not later than 10 days before the transfer, you must pay us a non-refundable "Transfer Fee" of $10,000. The Transfer Fee is subject to adjustment in our discretion based on corresponding changes in the CPI since the Effective Date.

(d) You do not have a right to pledge, encumber, hypothecate or otherwise give any third party a security interest in this Agreement in any manner whatsoever (except that with our consent, which will not be unreasonably withheld, you may pledge a security interest in this Agreement in connection with a Small Business Administration loan), nor subfranchise or otherwise transfer, or attempt to subfranchise or otherwise transfer the Franchised Business, or to transfer or subfranchise a portion but not all of your rights hereunder without our express prior written consent, which may be withheld for any reason in our sole discretion.

(e) Any attempt by you to assign or any purported Assignment by You in violation of this section 12.2 is void and will (i) constitute a material breach of this Agreement, (ii) cause this Agreement (and in our sole discretion any or all other agreements between you and us, or between you and our affiliates) to be subject to immediate termination without further notice, and (iii) confer no rights or interest whatsoever under this Agreement upon any other party.

(f) Upon our consent to any Assignment by You, you must bring all accounts with us current and transfer to your assignee all membership contracts signed by customers of the Franchised Business conducted at your Outlet. Also, you must (i) execute an agreement among you, ILKB and your assignee effecting the Assignment by You, which will include a mutual release between you and ILKB and (ii) enter into an assignment of the lease for the Outlet premises (including an assignment to the assignee of your rights, title and interest to telephone numbers and utilities respecting the Outlet).

**<u>12.3 Right of First Refusal</u>.**

(a) Except for a transfer (i) to your heirs, personal representatives or conservators in the case of death or legal incapacity as provided in section 12.6 hereof or (ii) between or among individuals (including their immediate family members) who have guaranteed obligations under a Small Business Administration loan, your right to transfer your entire interest in the Franchise granted by this Agreement under section 12.2 hereof is subject to our right of first refusal, which will be exercised in accordance with the terms of this section 12.3.

(b) You must deliver to us a written notice setting forth (i) all of the terms and conditions of any *bona fide* offer relating to a proposed Assignment by You, and (ii) all available information concerning your Assignee including a detailed summary of how the proposed assignee meets our qualifications for a new iLoveKickboxing.com franchisee, and any other related information requested by us. If the specified terms and conditions include consideration of a non-monetary nature, such consideration must be expressed in reasonably equivalent monetary terms, and if it involves matters that cannot be stated in monetary terms, such consideration will not be considered in connection with our right of first refusal.

(c) Within 15 days after our receipt of such notice (or if we request additional information, within 10 days after receipt of such additional information), we may either (i) consent or withhold our consent to such Assignment by You, in accordance with section 12.2 hereof, or (ii) at our option, accept the Assignment by You ourselves or on behalf of our nominee upon the terms and conditions specified in the notice.

(d) If we elect not to exercise our right of first refusal and consent to the Assignment by You, you will for a period of 60 days, and subject to the provisions of section 12.2 hereof, be free to assign this Agreement to such proposed Assignee upon the terms and conditions specified in said notice. If, however, these terms are modified in any material manner (as determined by us), or if said 60-day period expires, we will again have such right of first refusal with respect thereto and you will again be required to comply with section 12.3(b) above. Detailed terms of assignment must be delivered to us no later than 72 hours following the close of escrow or other consummation of the transaction.

**<u>12.4 Transfers to Certain Family Members</u>.**
You or a Principal Equity Owner, if a natural person, may with our consent, which will not be unreasonably withheld, transfer the Franchised Business or an equity interest in your franchised entity to such person's spouse or person having equivalent rights under applicable federal or state law, parent, sibling, niece, nephew, descendant or spouse's descendant provided that adequate provision is made for the management of the Franchised Business and the transferor guarantees, in form and substance satisfactory to us, the performance of the transferee's obligations under this Agreement. No transfer under this section 12.4 will be subject to our right of first refusal set forth in section 12.3 hereof. However, you must comply with section 12.2(b)(i) through (vi) above, as well as provide full disclosure of the terms of said transfer and deliver to us no later than three business days prior to the close of the transaction. In addition, copies of fully executed paperwork must be delivered to us no less than three business days following the close of the transaction.

**<u>12.5 Transfers to Affiliated Entities</u>.**
You or a Principal Equity Owner may without our consent, upon 30 days prior written notice to us, Transfer the Franchised Business or an equity interest in your franchised entity to an entity that is (i) organized for the purpose of operating the Franchised Business and (ii) owned in the same proportionate amount of ownership as prior to such Transfer, provided that adequate provision is made for the management of the Franchised Business. No Transfer under this section 12.5 will be subject to our right of first refusal set forth in section 12.3 hereof or the Transfer Fee

set forth in section 12.2(b)(vii) hereof. However, you must comply with section 12.2(b)(i) through (vi) above, as well as provide full disclosure of the terms of said transfer and deliver to us no later than three business days prior to the close of the transaction. In addition, copies of fully executed paperwork must be delivered to us no less than three business days following the close of the transaction.

**12.6 Transfers upon the Death or Incapacity of an Individual Franchisee or Majority Equity Owner.**

(a) Notwithstanding the foregoing, in the event of your death or legal incapacity, if you are an individual, or the death or legal incapacity of a Principal Equity Owner holding a majority equity interest ("Majority Equity Owner") if you are a corporation, limited liability company or partnership, the transfer of your or the deceased Majority Equity Owner's interest in this Agreement to his or her heirs, personal representatives or conservators, as applicable, will not be deemed an Assignment by You provided that a responsible management employee or agent of yours that has been satisfactorily trained by us will be responsible for the Franchised Business.

(b) In the event of the death of a sole proprietor franchisee or the death of a Majority Equity Owner, such person's interest in this Agreement or its equity interest in the franchise entity must Transfer as soon as practicable (but not more than 270 days) after the date of death in accordance with such person's will or, if such person dies without a will, in accordance with laws of intestacy governing the distribution of such person's estate, provided that adequate provision is made for the management of the Franchised Business. If we determine (i) there is no imminent sale to a qualified successor or (ii) there is no heir or other Principal Equity Owner capable of operating the Franchise, we may (but are not obligated to) immediately commence operating the Outlet on your behalf for a period of up to 90 days, renewable as necessary for up to one year and we will periodically discuss the status with the heirs of the decedent. For such management assistance, you or the successor in interest must pay a reasonable *per diem* charge we set for the interim manager.

(c) No Transfer under this section 12.6 will be subject to (i) our right of first refusal set forth in section 12.3 hereof or (ii) the Transfer Fee set forth in section 12.2(b)(vii) above, although such refusal right and Transfer Fee will be applicable to any subsequent Transfer by your (or a Majority Equity Owner's) heirs, personal representatives or conservators. However, you must comply with section 12.2(b)(i) through (vi) above, as well as provide full disclosure of the terms of said transfer and deliver to us no later than three business days prior to the close of the transaction. In addition, copies of fully executed paperwork must be delivered to us no less than three business days following the close of the transaction.

**12.7 Consent to Transfers.**

Except as otherwise provided in this Agreement and subject to our right of first refusal provided in section 12.3 hereof, you or an Principal Equity Owner may consummate any Transfer of a direct or indirect interest in this Agreement, the Franchised Business or the economic benefits derived therefrom, or any equity interest in your franchised entity, not permitted by the preceding sections 12.4, 12.5 and 12.6, only after written notice to us and only with our written consent, which will not be unreasonably withheld. We will exercise our good faith business judgment in determining whether to give or withhold our consent to a Transfer under this section 12.7. Such exercise of good faith business judgment may include our consideration of certain skills and qualifications of the prospective transferee which are of business concern to us, including without limitation, the following: experience in businesses similar to the Franchised Business, financial and operational skills and qualifications, economic resources, reputation and character of such prospective transferee; the ability of such prospective transferee to fully and faithfully conduct the Franchised Business as contemplated by this Agreement; and the effect that the Transfer and the prospective transferee will have or may reasonably be expected to have on the reputation or business operations of the Franchised Business, the System or us or any of our affiliates.

## XIII. DEFAULT AND TERMINATION

**13.1 General.**

(a) This Agreement may be by us only for good cause, which means your failure to substantially comply with the lawful requirements imposed upon you by this Agreement after being given notice at least 30 days in advance of the termination and a reasonable opportunity, which in no event will be less than 30 days from the date of the notice of noncompliance, to cure the failure (provided that this section 13.1(a) does not apply when there are grounds for immediate termination without notice pursuant to section 13.2 below).

(b) If we are in material breach of this Agreement, you may terminate this Agreement by giving us prior written notice setting forth the asserted breach of this Agreement and giving us 30 days in which to cure the default. A material breach of this Agreement by us means any unauthorized action or omission seriously impairing or adversely affecting you or the relationship between you and us created by this Agreement. However, if ILKB becomes insolvent or declares bankruptcy, you will continue to have the right to operate under this Agreement until and unless a court orders otherwise.

(c) Notwithstanding anything contained herein to the contrary, in those circumstances under which we have the right to terminate this Agreement, we also have the option, to be exercised in our sole discretion, to choose alternative remedies to our right to terminate the entire Agreement.

(d) Notwithstanding anything contained herein to the contrary, in those circumstances under which we have the right to terminate this Agreement, we have the right to exercise any and all remedies available to us at law or in equity, including without limitation specific performance and damages (including punitive damages). All rights and remedies provided herein are in addition to and not in substitution of all other rights and remedies available to a party at law or in equity.

**13.2 Immediate Termination.**

(a) We have the right to terminate this Agreement immediately upon notice to you without an opportunity to cure:

(i) You admit your inability to pay your debts as they come due, or you or the business to which the Franchise relates (A) has been the subject of an order for relief in bankruptcy, (B) is judicially determined to be insolvent or (C) has all or a substantial part of your or its assets assigned to or for the benefit of any creditor;

(ii) You Abandon the Franchise by failing to operate the Outlet for five consecutive business days during which you are required to operate the business under the terms of this Agreement, or any shorter period after which it is not unreasonable under the facts and circumstances for us to conclude that you do not intend to continue to operate the Franchise, unless such failure to operate is due to fire, flood, earthquake or other similar causes beyond your control;

(iii) We and you agree in writing to terminate the Franchise;

(iv) You make any material misrepresentations relating to the acquisition of the Franchise or you engage in conduct that reflects materially and unfavorably upon the operation and reputation of the Franchised Business or the System;

(v) You fail, for a period of 10 days after notification of noncompliance, to comply with any federal, state, or local law or regulation, including, but not limited to, all health, safety, building, and labor laws or regulations applicable to the operation of the Franchise;

(vi) After curing any failure in accordance with section 13.3 below, you engage in the same noncompliance whether or not corrected after notice;

(vii) You repeatedly fail to comply with one or more requirements of this Agreement, whether or not corrected after notice;

(viii) The Franchised Business or business premises of the Franchise are seized, taken over or foreclosed by a government official in the exercise of his or her duties, or seized, taken over or foreclosed by a creditor, lien holder or lessor, provided that a final judgment against you remains unsatisfied for 30 days (unless an appeal bond has been filed); or a levy of execution has been made upon the license granted by this Agreement or upon any property used in the Franchised Business, and it is not discharged within five days of such levy;

(ix) You are convicted of a felony or any other criminal misconduct (including intentional conversion of cash proceeds received from your customers but not reported as Gross Revenues) which is relevant to the operation of the Franchise;

(x) If an audit or investigation conducted by us discloses that you knowingly maintained false books or records, or submitted false reports to us, or knowingly understated your Gross Revenues or you withheld the

reporting of any of your Gross Revenues, or reveals an underreporting or under recording error on any single occasion of 5% or more;

(xi) We make a reasonable determination your continued operation of the Franchise will result in an imminent danger to public health or safety;

(xii) If after you have located and secured suitable premises (that we consent to) for your Outlet, you have not commenced operation of the Franchised Business within 365 days after the Effective Date; or

(xiii) If you default in any material obligation in respect of which you twice previously within the preceding 12 months have received a notice of default from us with respect to the same or similar breach.

**13.3 Termination After Notice.**

(a) If we give you written notice to cure a violation of Article IX of this Agreement (which may include a statement of the method of cure to be employed), you must commence such cure within two business days and must effect a complete cure and remedy the damage caused by such violation as fully as possible in the shortest possible time, in no event more than seven days; and you must take reasonable action to prevent recurrence of the same type of violation.

(b) If you and we agree to mutually terminate this Agreement, you must return a signed counterpart of any document we prepare to effect the termination not later than seven days after you receive it, or the mutual agreement to terminate will be voidable by us and we may thereafter immediately and unilaterally terminate this Agreement and require payment of all sums due and payable to us at the date of termination.

(c) Except as provided in sections 13.2, 13.3(a) and 13.3(b) hereof, we may terminate this Agreement for your material breach (including without limitation any default by you of your obligation to pay any sums due us under this Agreement) only after giving you prior written notice setting forth the asserted breach of this Agreement and giving you 30 days in which to cure the default. Upon receipt of a notice of default, you must immediately commence diligently to cure said breach, and if you cure said breach within 30 days, our right to terminate this Agreement will cease. If because of the nature of the breach, it would be unreasonable for you to be able to cure the default within 30 days, you will be given additional time (up to 15 additional days) as is reasonably necessary in our determination to cure said breach, upon condition that you must, upon receipt of such notice from us, immediately commence to cure such breach and continue to use your best efforts to do so.

(d) If your rights under this Agreement are terminated by us for material breach, we may, at our option, declare you in default of all of the other franchise agreements or other agreements you have with us, and terminate your rights under those other agreements as well.

(e) The description of any default in any notice served by us hereunder upon you in no way precludes us from specifying additional or supplemental defaults in any action, arbitration, mediation, hearing or suit relating to this Agreement or the termination thereof.

**13.4 Description of Default.**
The description of any default in any notice served by us hereunder upon you in no way precludes us from specifying additional or supplemental defaults in any action, arbitration, mediation, hearing or suit relating to this Agreement or the termination thereof.

**13.5 Statutory Limitations.**
Notwithstanding anything to the contrary in this Article XIII, in the event any valid, applicable law or regulation of a competent governmental authority having jurisdiction over this Agreement or the parties hereto limits our rights of termination hereunder or requires longer notice periods than those set forth herein, and in the event the parties are prohibited by law from agreeing to the shorter periods set forth herein, then this Agreement will be deemed amended to conform to the requirements of such laws and regulations, but in such event the provisions of the Agreement thus affected will be amended only to the extent necessary to bring it within the requirements of the law or regulation.

**13.6 Extended Cure Period.**
Notwithstanding anything contained herein to the contrary, including, without limitation, section 13.3(c) hereof, in those circumstances under which we have the right to terminate this Agreement, we also have the right, to be exercised in our sole discretion, to grant to you in writing only, in lieu of termination of this Agreement, an extended period of time to cure the breach which gave rise to our right to terminate, but in no event may such extended cure period exceed six months from the last day of the cure period otherwise applicable to such breach. You acknowledge that our election to grant an extended cure period to you will not operate as a waiver of any of our rights hereunder.

**13.7 Our Right to Cure Your Defaults.**
In addition to all other remedies herein granted, if you default in the performance of any of your obligations or breach any term or condition of this Agreement or any related agreement involving third parties, we may, at our election, immediately or at any time thereafter, without waiving any claim for breach hereunder and without notice to you, cure the default for your account and on your behalf, and all costs or expenses including attorney's fees incurred by us on account thereof are due and payable by you to us on demand.

**13.8 Waiver and Delay.**
No waiver by us of any breach or series of breaches or defaults in performance by you and no failure, refusal or neglect of ours either to exercise any right, power or option given to us hereunder or to insist upon strict compliance with or performance of your obligations under this Agreement or the Confidential Operations Manual, constitutes a waiver of the provisions of this Agreement or the Confidential Operations Manual with respect to any subsequent breach thereof or a waiver by us of our right at any time thereafter to require exact and strict compliance with the provisions thereof.

**13.9 Recovery of Lost Royalty.**
If this Agreement is terminated because of your material breach, based on the estimated time it takes for a replacement franchise outlet to achieve a similar revenue stream, we are entitled to recover liquidated damages equal to the amount of the Royalty paid by you during (i) the three years prior to the date this Agreement was terminated or (ii) if the Opening Date is less than three years before the termination date, the time since the Opening Date.

**13.10 Collection Costs.**
We are entitled to reimbursement from you upon our demand of all costs we have incurred (including reasonable attorneys fees) to enforce our rights under this Agreement, including actions to collect any amounts due and delinquent hereunder.

**13.11 Continuance of Business Relations.**
Any continuance of business relations between you and us after termination of this Agreement will not be construed as a renewal, extension or continuation of this Agreement.

## XIV. DISPUTE RESOLUTION

**14.1 Mediation.**

(a) We and you have entered into a long term franchise relationship which gives rise to an obligation, subject to and consistent with the terms of this Agreement, to endeavor to make the relationship succeed, in light of the overall best interests of the System, as contemplated by this Agreement. To that end, you and we acknowledge that you and we need to attempt to resolve disagreements or disputes before such disagreements or disputes negatively impact the relationship. Good faith communications between us are an important aspect of that obligation. The parties hereby pledge and agree that they will first attempt to resolve any dispute, claim or controversy arising out of or relating to this Agreement or any alleged breach hereof, including any claim that this Agreement or any part hereof is invalid, illegal or otherwise voidable or void (collectively, "Dispute") by first having our executive officers and your Principal Equity Owners meet in person at our principal executive office (without our respective legal counsel) and conduct a good faith discussion and negotiation of the issues with a view to arriving at a settlement.

(b) If we are unable to settle the Dispute at this settlement conference, within 10 days after that conference we will submit the Dispute to mediation conducted by a mediator appointed by JAMS, Inc. ("JAMS") in accordance with its procedures, unless the parties agree on a different mediator within 15 days after either party first gives notice of mediation. The mediation proceedings will be conducted in New York County, New York and should be

completed within 45 days following the date either party first gives notice of mediation. The fees and expenses of the mediator will be shared equally by the parties. The mediator will be disqualified as a witness, expert or counsel for any party with respect to the Dispute and any related matter. Mediation is a compromise negotiation and will constitute privileged communications under the law governing this Agreement. The entire mediation process will be confidential and the conduct, statements, promises, offers, views and opinions of the mediator and the parties will not be discoverable or admissible in any legal proceeding for any purpose; provided, however, that evidence which is otherwise discoverable or admissible will not be excluded from discovery or admission as a result of its use in the mediation.

**14.2 Arbitration.**

**(a) Any Dispute between us (and/or our affiliated entities) and you (and/or your Principal Equity Owners or affiliated entities) that is not resolved through mediation will be resolved through binding arbitration by one arbitrator from the list of retired judges referred by JAMS and selected by the parties in accordance with its Streamlined Arbitration Rules and Procedures (if the amount in controversy is less than $250,000) or its Comprehensive Arbitration Rules and Procedures (if the amount in controversy is $250,000 or more), or if the parties in dispute mutually agree, through binding arbitration by any other mutually agreeable arbitration organization. It is explicitly agreed by each of the parties hereto that no arbitration of any Dispute may be commenced except in accordance with this section 14.2.**

**(b) Arbitration proceedings will be conducted individually by a single plaintiff, and not as a class or by multiple plaintiffs in one action. All hearings and other proceedings will take place in New York County, New York, or other county where our headquarters is then located, or if we so elect, at the JAMS business location nearest where your (or an applicable Principal Equity Owner's) principal place of business is then located.**

**(c) Either party may present briefs and affidavits of witnesses who are unable to attend hearings. A limited amount of discovery is permitted within the discretion of the arbitrator (including affidavits, interrogatories and depositions). The arbitrator will have the right to award or include in the award any relief that the arbitrator deems proper in the circumstances, including money damages (with interest on unpaid amounts from the date due), specific performance and injunctive relief, provided that the arbitrator will not have the right to declare any Mark generic or otherwise invalid or to award punitive damages. The arbitration award will be final and binding on the parties, and judgment on the award may be entered in any federal or state court having jurisdiction.**

**(d) This arbitration provision is deemed to be self-executing and will remain in full force and effect after expiration or termination of this Agreement. If either party fails to appear at any properly noticed arbitration proceeding, an award may be entered against such party by default or otherwise notwithstanding said failure to appear.**

**(e) The provisions of this section 14.2 are intended to benefit and bind certain third-party non-signatories and will continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement. Furthermore, this section 14.2 will be construed as independent of any other covenant or provision of this Agreement; provided, however, that if a court of competent jurisdiction determines that any of such provisions are unlawful in any way, the court is respectfully requested to modify or interpret such provisions to the minimum extent necessary to comply with the law.**

**[Our Initials: DS RG Your Initials: DS BSA ]**
**[Principal Equity Owners' Initials: _______ _______ _______ ______ ______ ]**

**14.3 Injunctive Relief.**
Any party has the right in a situation where there is an imminent threat of harm to the legal rights of a party and damages would not be adequate relief to seek a temporary restraining order and temporary or preliminary injunctive relief from a court of competent jurisdiction in New York, without the necessity of first complying with sections 14.1 and 14.2 above or posting any bond, and if bond is nevertheless required by a court of competent jurisdiction, the parties agree that the sum of $1,000 will be a sufficient bond (this amount may be adjusted by changes in the Consumer Price Index since the Effective Date). If an arbitration proceeding has already commenced pursuant to section 14.2 above when a party seeks injunctive relief, then the party seeking such injunctive relief agrees to

contemporaneously submit the merits of its dispute to the arbitrator. The existence of a proceeding commenced under section 14.1 or 14.2 above will in no event abate or otherwise affect the ability of party to seek injunctive relief on account of this section 14.3. You acknowledge that you are one of a number of licensed franchisees using the Marks and that failure on your part to comply fully with any of the terms of this Agreement respecting the obligations regarding examinations, audits and the Marks could cause irreparable damage to us or other affiliated persons or entities and we or our affiliates could seek injunctive relief to protect the Marks. This covenant is independent, severable and enforceable notwithstanding any other rights or remedies that any party may have.

**<u>14.4 Legal Fees and Expenses</u>.**
The prevailing party in any arbitration or litigation to resolve a dispute between any of the parties hereto will be entitled to recover from the losing party reasonable legal fees (and incurred costs of the prevailing party's counsel) and all other expenses incurred by the prevailing party in bringing or defending such arbitration, action or proceeding and/or enforcing any resulting award or judgment (including without limitation arbitration or court filing fees, expert and other witness fees, discovery expenses and compensation payable to the arbitrator), whether incurred prior to or in preparation for or in contemplation of the filing of the action or thereafter. The prevailing party will be determined by the arbitrator or court. This section 14.4 is intended to be expressly severable from the other provisions of this Agreement, is intended to survive any judgment and is not to be deemed merged into the judgment.

**<u>14.5 Survival</u>.**
The terms of this Article XIV survive termination, expiration or cancellation of this Agreement.

## XV. OBLIGATIONS AND RIGHTS UPON TERMINATION OR EXPIRATION

**<u>15.1 Your Obligations</u>.**

(a) In the event of termination, cancellation or expiration of this Agreement whether by reason of your breach, default, non-renewal, lapse of time or other cause, in addition to any other obligations provided for in this Agreement, you must forthwith discontinue the use or display of the Marks in any manner whatsoever, and you may not thereafter operate or do business under the Marks or any other iLoveKickboxing.com brand or any other name or in any manner that might tend to give the general public the impression that you are in any way associated or affiliated with us, or any of the businesses conducted by us or the owner of the Marks, including without limitation repainting the business premises in a distinctively different color and removing or rearranging distinctive elements of the iLoveKickboxing.com trade dress. You must contact Yelp, other online review sites and other online directories and websites, and request the removal of all use of the trademarks in connection with the former iLoveKickboxing.com outlet (and the physical address of the former iLoveKickboxing.com outlet) and all use of former reviews from the period you were an iLoveKickboxing.com franchisee. And, you also must comply with section 15.2 respecting the return to us of certain materials and must not thereafter use, in any manner, or for any purpose, directly or indirectly, any of our trade secrets, procedures, techniques, or materials acquired by you by virtue of the relationship established by this Agreement, including, without limitation, (i) any training or other materials, manuals, bulletins, instruction sheets, or supplements thereto, or (ii) any equipment, videotapes, videodiscs, forms, advertising matter, devices, insignias, slogans or designs used from time to time in connection with the Franchised Business.

(b) If there is a termination, cancellation or expiration as described in section 15.1(a) above, you must comply with section 11.2 of this Agreement respecting post-termination competition and also promptly:

(i) Remove at your expense all signs erected or used by you and bearing the Marks, or any word or mark indicating that you are associated or affiliated with ILKB;

(ii) Erase or obliterate from letterheads, stationery, printed matter, advertising or other forms used by you the Marks and all words indicating that you are associated or affiliated with ILKB;

(iii) Permanently discontinue all advertising of yours that states or implies that you are associated or affiliated with ILKB or the System;

(iv) If you engage in any business thereafter, you must use trade names, service marks or trademarks that are significantly different from those under which you had done business and must use sign formats that are significantly different in color and type face; and take all necessary steps to ensure that your present and former employees, agents, officers, shareholders and partners observe the foregoing obligations; and

(v) Assign all interest and right to use all telephone numbers and all listings applicable to the Outlet in use at the time of such termination to us and take all action necessary to change all such telephone numbers immediately and change all such listings as soon as possible.

(c) If you fail or omit to make or cause to be made any removal or change described in section 15.1(b)(i) through 15.1(b)(vi) above, then we will have the right within 15 days after written notice to enter your Outlet or other premises from which the Franchised Business is being conducted without being deemed guilty of trespass or any other tort, and make or cause to be made such removal and changes at your expense, which expenses you agree to pay to us promptly upon demand; and you hereby irrevocably appoint us as your lawful attorney upon termination of this Agreement with authority to file any document in the name of and on our behalf for the purpose of terminating any and all of your rights in any trade name you have used that contains any of the Marks.

**15.2 Our Rights as Franchisor.**

(a) The termination, cancellation, expiration or assignment of this Agreement will be without prejudice to any rights of us against you and such termination, cancellation, expiration or assignment will not relieve you of any of your obligations to us existing at the time of termination, cancellation, expiration or assignment or terminate those obligations of ours which, by their nature, survive the termination, cancellation, expiration or assignment of this Agreement.

(b) We may direct that all applicable suppliers immediately cease providing you with equipment, marketing materials, e-mail access, website access, accessories and other items comprising or to be used to provide ILKB Services and Products.

(c) You are obligated to return, at no expense to us, any and all copies of the Confidential Operations Manual and all other iLoveKickboxing.com proprietary materials and any other items that were supplied by us for your use without additional charge in connection with the operation of the Franchised Business. You must also permanently erase anything relating to us or the Franchised Business from any computers and other media storage devices you retain after expiration, cancellation or termination of this Agreement.

(d) Within 30 days after termination, expiration or non-renewal of this Agreement, we will have the option, but not the obligation, to purchase all or any portion of your reusable inventory, apparel containing the Marks, proprietary equipment, parts, fixtures and furnishings owned and used by you in your franchised operation. We will be permitted to deduct and withdraw from the purchase price to be paid to you all sums then due and owing to us. The purchase price for your inventory of apparel containing the Marks will be at your cost for said items. The purchase price for the proprietary equipment, parts, fixtures and furnishings will be the fair market value thereof as we mutually determine. In determining the fair market value of such items you and we agree to exclude any factor or increment for goodwill or going concern value. The purchase price to be paid to you will be paid in cash at the closing of any purchase that will occur no less than 30 days from the date we exercise our option, unless you and we are unable to agree on the fair market value of the assets to be purchased. If you and we are unable to reach agreement within a reasonable time as to the fair market value of the items we have agreed to purchase, we will designate an independent appraiser, and the appraiser's determination will be binding. You and we must each pay 50% of the fee charged by the independent appraiser.

## XVI. GENERAL TERMS AND PROVISIONS

**16.1 Notices.**

(a) All notices that the parties hereto are required or may desire to give under or in connection with this Agreement will be in writing and (unless personally delivered by an agent of the sending party) must be sent by reliable overnight courier, for delivery on the next business day and addressed as follows:

(i) If to us:

ILKB LLC
1844 LANSDOWNE AVE
MERRICK NY 11566-3821
Phone: (516) 543-0041

(ii) If to you:

Benjamin S. Alcid
BigDog NEST Incorporated
910 Longbow Road
Mount Airy, MD 21771
Phone: Benjamin S. Alcid

(b) Notices between you and us will be deemed given the earlier of (i) the next business day after deposit with a reliable overnight courier, properly addressed and marked for delivery on the next business day or (ii) when actually delivered in person by the sending party or his, her or its agent.

(c) Any change in the addresses listed in section 16.1(a) above must be sent to the other party as soon as practicable after the change occurs by reliable overnight courier.

**16.2 Indemnity.**

(a) You and your Principal Equity Owners, jointly and severally, hereby agree to protect, defend and indemnify ILKB, and all of our past, present and future owners, affiliates, officers, directors, employees and designees, and each of them, and hold them harmless from and against any and all costs and expenses, including attorneys fees, court costs, losses, liabilities, damages, claims and demands of every kind or nature on account of any actual or alleged loss, injury or damage to any person or entity or to any property arising out of or in connection with your development, maintenance or operation of the Outlet and the Franchised Business, except if caused by our intentional misfeasance, gross negligence or material default of our obligations under this Agreement.

(b) We hereby agree to protect, defend and indemnify you, your Principal Equity Owners, other owners, affiliates, officers, directors, employees and designees, and each of them, from any liability or damage any of them may incur, including reasonable attorneys fees, as a result of third party claims, demands, costs, or judgments of any kind or nature, arising out of (i) your operation of the Franchised Business in full compliance with the terms of this Agreement and the Confidential Operations Manual or (ii) our intentional misfeasance, gross negligence or material breach of our obligations under this Agreement, except if caused by the intentional misfeasance, gross negligence or material breach by you (or any Principal Equity Owners, or other of your owners, affiliates, officers, directors or employees) of obligations under this Agreement.

(c) In order for the indemnification to be effective, each party entitled to indemnification hereunder must give the indemnifying party prompt written notice of any claim for which the indemnified party demands indemnity (provided that such obligation will not constitute a condition to the indemnifying party's indemnification obligation unless the indemnifying party has been materially harmed by such delay). We will retain the full right and power to direct, manage, control and settle the litigation of any claim. Each indemnified party must submit all of its claims to its insurers in a timely manner. Any payments made by an indemnified party will be net of benefits received by any indemnified party on account of insurance in respect of such claims.

**16.3 Your Relationship to Us as Franchisee.**
It is expressly agreed that the parties intend by this Agreement to establish between you and us the relationship of franchisee and franchisor. It is further agreed that you have no authority to create or assume in our name or on our behalf, any obligation, express or implied, or to act or purport to act as agent or representative on our behalf for any purpose whatsoever. Neither you nor we are the employer, employee, agent, partner, fiduciary or co-venturer of or with the other, each being independent. You agree that you will not hold yourself out as our agent, employee, partner or co-venturer or the Owner of the Marks. All employees or agents hired or engaged by or working for you will be only the employees or agents of yours and will not for any purpose be deemed employees or agents of ours or the Owner of the Marks, nor subject to our control; and in particular, we will have no authority to exercise control over the hiring or termination of these employees, independent contractors, or others who work for you, their compensation, working hours or conditions, or their day-to-day activities, except to the extent necessary to protect the Marks. You agree to respond to customer indications of dissatisfaction with services rendered by you in a diligent and professional manner and agree to cooperate with representatives of ours or the Owner of the Marks in any investigation undertaken by us of complaints respecting your activities. You and we agree to file our own tax, regulatory and payroll reports with respect to our respective employees or agents and operations, saving and indemnifying the other party hereto of and from any liability of any nature whatsoever by virtue thereof.

**16.4 No Third Party Beneficiaries.**
This Agreement is not intended to benefit any other person or entity except the named parties hereto and no other person or entity (other than financing sources to whom we may have granted or consented to a collateral assignment of this Agreement) will be entitled to any rights hereunder by virtue of so-called "third party beneficiary rights" or otherwise.

**16.5 Survival of Covenants.**
The covenants contained in this Agreement that by their terms require performance by the parties after the expiration or termination of this Agreement will be enforceable notwithstanding said expiration or other termination of this Agreement for any reason whatsoever.

**16.6 Successors and Assigns.**
This Agreement is binding upon (i) us and inures to the benefit of our successors and assigns and (ii) you and inures to the benefit of your successors and assigns, subject to the restrictions on Assignment by You contained herein.

**16.7 Joint and Several Liabilities.**
If the entity that is the franchisee under this Agreement consists of more than one person or entity, or a combination thereof, the obligations and liabilities of each such person or entity to us are joint and several.

**16.8 Titles for Convenience Only.**
Section titles used in this Agreement are for convenience only and do not affect the meaning or construction of any of the terms, provisions, covenants or conditions of this Agreement.

**16.9 Gender.**
All terms used in any one number or gender will extend to mean and include any other number and gender as the facts, context or sense of this Agreement or any section may require.

**16.10 Severability; Partial Invalidity.**
Nothing contained in this Agreement will be construed as requiring the commission of any act contrary to law. Whenever there is any conflict between (i) any provisions of this Agreement or the Confidential Operations Manual and (ii) any present or future statute, law, ordinance, regulation or judicial decision, contrary to which the parties have no legal right under this Agreement, the latter will prevail, but in such event the provision of this Agreement or the Confidential Operations Manual thus affected will be curtailed and limited only to the extent necessary to bring it within the requirements of the law. In the event that any part, article, section, sentence or clause of this Agreement or the Confidential Operations Manual is held to be indefinite, invalid or otherwise unenforceable, that specific language will be deemed deleted but the remaining parts thereof will continue in full force and effect.

**16.11 Counterparts.**
This Agreement may be executed in multiple copies, each of which will be deemed to be an original, and both of which together will be deemed to be one and the same instrument.

**16.12 Compliance with U.S. Anti-Terrorism and Other U.S. Federal Laws.**

(a)    You and each of the Principal Equity Owners certify that none of you, the Principal Equity Owners, employees, or anyone associated with you is listed in the Annex to Executive Order 13224 (available at http://treasury.gov/offices/enforcement/ofac/sanctions/terrorism.html). You covenant not to hire or have any dealings with a person listed in the Annex. You certify that you have no knowledge or information that, if generally known, would result in you, the Principal Equity Owners, employees or anyone associated with you being listed in the Annex to Executive Order 13224. You and each of the Principal Equity Owners will comply with and assist us to the fullest extent possible in our efforts to comply with the Anti-Terrorism Laws (as defined below). In connection with such compliance, you and each of the Principal Equity Owners certify, represent and warrant that none of your respective property or interests is subject to being "blocked" under any of the Anti-Terrorism Laws and that you and the Principal Equity Owners are not otherwise in violation of any of the Anti-Terrorism Laws. You are solely responsible for ascertaining what actions must be taken by you to comply with all such Anti-Terrorism Laws. You specifically acknowledge and agree that your indemnification responsibilities as provided in this Agreement pertain to your obligations under this section 16.12. Any misrepresentation by you under this section 16.13 or any violation of the Anti-Terrorism Laws by you, any of the Principal Equity Owners, or employees will constitute grounds for immediate termination of this Agreement and any other agreement you entered into with us or one of our Affiliates. "Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the Terrorism

Sanctions Regulations (Title 31, Part 595 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31, Part 597 of the U.S. Code of Federal Regulations), the Cuban Assets Control Regulations (Title 31, Part 515 of the U.S. Code of Federal Regulations), the USA PATRIOT Act, and all other present and future federal, state and local laws, ordinances, regulations, policies, lists, and any other requirements of any United States governmental authority (including, without limitation, the United States Department of Treasury Office of Foreign Assets Control) addressing or in any way relating to terrorist acts and acts of war.

(b) Neither you nor any Principal Equity Owner conducts any activity, or has failed to conduct any activity, if such action or inaction constitutes a money laundering crime, including any money laundering crime prohibited under any applicable Anti-Terror Legislation.

(c) Neither you nor any Principal Equity Owner nor any employee of either is named as a “Specially Designated National” or “Blocked Person” as designated by the U.S. Department of the Treasury’s Office of Foreign Assets Control, and published at www.treas.gov/offices/enforcement/ofac/sdn/. You acknowledge that you are not directly or indirectly owned or controlled by the government of any country that is subject to a United States embargo, nor do you or any Principal Equity Owner act directly or indirectly on behalf of the government of any country that is subject to a United States embargo. You and the Principal Equity Owners agree that you will notify us in writing immediately of the occurrence of any event that renders the foregoing representations and warranties of this section 16.12 incorrect.

**[Your Initials: __BSA__ Principal Equity Owners' Initials: _______ _______ _______ ______ ______ ]**

**<u>16.13 Governing Law</u>.**
The Federal Arbitration Act (9 U.S.C. §1 *et seq*.) governs the arbitration of disputes under this Agreement. Otherwise, the laws of New York govern this Agreement and all related matters, documents and agreements, without regard to conflicts of laws. If any provision of this Agreement is impermissible under a governing law, the provision will be deemed amended to conform to that law while maintaining to the maximum extent possible the original intent of the provision, or if the provision as amended cannot substantially maintain the original intent, then the provision will be deemed deleted.

**<u>16.14 Entire Agreement</u>.**

(a) This Agreement and all exhibits to this Agreement constitute the entire agreement between the parties and supersede any and all prior negotiations, understandings, representations and agreements. Nothing in this or in any related agreement, however, is intended to disclaim the representations we made in the iLoveKickboxing.com Franchise Disclosure Document (“FDD”) that we furnished to you.

(b) You acknowledge that you are entering into this Agreement as a result of your own independent investigation of our franchised business and not as a result of any representations about us made by our shareholders, officers, directors, employees, agents, representatives, independent contractors, or franchisees that are contrary to the terms set forth in this Agreement, or in any disclosure document, prospectus, or other similar document required or permitted to be given to you pursuant to applicable law.

(c) This Agreement cannot be modified or changed except by written instrument signed by all of the parties hereto.

## XVII. EFFECTIVENESS OF AGREEMENT

This Agreement will become effective only upon the execution thereof by you and by us, and only after you were provided with an FDD. HOWEVER, THIS AGREEMENT IS NOT BINDING ON US UNLESS AND UNTIL IT HAS BEEN ACCEPTED AND SIGNED BY OUR DIRECTOR OF FRANCHISE DEVELOPMENT.

## XVIII. ACKNOWLEDGMENTS AND REPRESENTATIONS

**<u>18.1 Acknowledgments and Representations</u>.**

(a) You and each of your Principal Equity Owners represent and warrant that the following statements in this section 18.1 are true and accurate.

(b) You do not seek to obtain the Franchise for speculative or investment purposes and have no present intention to sell or transfer or attempt to sell or transfer the Franchised Business or the Franchise within 12 months after the Opening Date.

(c) You understand and acknowledge the value to the System of uniform and ethical standards of quality, appearance and service described in and required by the Confidential Operations Manual and the necessity of operating the Franchised Business under the standards set forth in the Confidential Operations Manual. You represent that you have the capabilities, professionally, financially and otherwise, to comply with our standards.

(d) If you are an entity, you are duly organized and qualified to do business in the state and any other applicable jurisdiction within which the Outlet is located.

(e) Your execution of this Agreement will not constitute or violate any other agreement or commitment to which you are a party.

(f) Any individual executing this Agreement on your behalf is duly authorized to do so and the Agreement constitutes a valid and binding obligation of yours and all of your Principal Equity Owners.

(g) You and your Principal Equity Owners (i) have carefully read this Agreement and all other related documents to be executed by you concurrently or in conjunction with the execution hereof, (ii) have conducted an independent investigation of the business contemplated by this Agreement, (iii) have obtained, or had the opportunity to obtain, the advice of counsel in connection with the execution and delivery of this Agreement, (iv) understand the nature of this Agreement, and (v) intend to comply herewith and be bound hereby. You also recognize that the Franchise involves significant risks, making the success of the Outlet largely dependent on your abilities and attention. We expressly disclaim the making of, and you agree that you have not received or relied on, any representation or warranty from us regarding the likelihood of your success at your Outlet or in your operating the Franchised Business.

(h) In entering into this Agreement, you have not relied on any representation by us, or any of our officers, directors, partners, shareholders, employees or agents concerning the Franchised Business that is contrary to the terms of this Agreement, the documents incorporated into this Agreement or attached to it, or the FDD that was provided to you.

(i) You agree that complete and detailed uniformity among our franchisees under varying conditions may be inadvisable, impractical or impossible, and accordingly agree that we, in our sole discretion, may modify or vary aspects of the System as to any franchisee or group of franchisees based on, for example, local sales potential, demographics, competition, business practices or other conditions. You further agree that we will have no obligation to disclose or offer the same or similar variances to you. You are aware that other iLoveKickboxing.com franchisees may operate under different agreements and, consequently, that our obligations and rights as to those franchisees may differ materially in certain circumstances.

(j) You received an FDD and a copy of this Agreement at least 14 calendar days before you signed this Agreement.

(k) You made no payment to us before you signed this Agreement.

(l) You and each Principal Equity Owner acknowledge that in operating the System, we must take into account the needs of the System as a whole, and the need to protect the Marks, even if our actions are contrary to your individual interests as a franchisee.

(m) You and each Principal Equity Owner acknowledge that the success of the business venture is speculative and depends in large part on your participation in the daily affairs of the Franchised Business.

**18.2 Additional Information Respecting You and Your Principal Equity Owners.**

(a) Attached as Exhibit 2 is a schedule containing complete information respecting your Principal Equity Owners.

(b) The address (written notice of any change in this information after the Effective Date must be delivered to us pursuant to section 16.1 hereof) where your financial and other records are maintained is either [x] the same address as provided in section 16.1 hereof, or [ ] the following address:

________________________________________
________________________________________.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Effective Date:

YOU:

BigDog NEST, Incorporated

By: DocuSigned by: Benjamin S. Alcid
5CFD45BF000E4EB...

Benjamin S. Alcid President
[PRINTED NAME AND TITLE]

ILKB:

ILKB LLC

By: DocuSigned by: Scott Ferrari
Scott Ferrari, Director of Franchise Development

PRINCIPAL EQUITY OWNERS
(*Note: each Principal Equity Owner is individually obligated as a party hereunder to perform or guarantee the performance by an entity franchisee of all duties and obligations of franchisee under this Agreement)*:

x__________________________________

___________________________________
[PRINTED NAME]

x__________________________________

___________________________________
[PRINTED NAME]

x__________________________________

___________________________________
[PRINTED NAME]

x__________________________________

___________________________________
[PRINTED NAME]

x__________________________________

___________________________________
[PRINTED NAME]

List of Exhibits to Franchise Agreement:

       Exhibit 1 – Territory and Location of Outlet

       Exhibit 2 – Names and Addresses of Principal Equity Owners

       Exhibit 3 – Statement of Franchisee

       Exhibit 4 – Addendum for Maryland Franchisees

**EXHIBIT 1 - TERRITORY AND LOCATION OF OUTLET**

The Territory is either [ ] a radius of ___ miles around the Outlet or [x] the geographical area surrounding the Outlet as depicted in a map attached to this Exhibit 1.

The Outlet is located at:

#20- Maryland

(If the address of the Outlet is unknown when this Agreement is signed, as soon as the address is determined it will be inserted later into the space above or added by addendum attached to this Exhibit 1.)

The Outlet must be open and operating not later than 2/24/2018.

**EXHIBIT 2 - NAMES AND ADDRESSES OF PRINCIPAL EQUITY OWNERS**

List below the names, residential addresses and respective percentage equity ownership interests in the franchisee entity of each Principal Equity Owner:

1. Benjamin S. Alcid
910 Longbow Road
Mount Airy, MD
21771

100% %

2. ______

______ %

3. ______

______ %

4. ______

______ %

5. ______

______ %

## EXHIBIT 3 - STATEMENT OF FRANCHISEE

## iLOVEKICKBOXING.COM
## STATEMENT OF FRANCHISEE

A. The following dates are true and correct:

1. 11/14/, 20 16 (Date) — DS BSA (Initials) — The date on which I received a Franchise Disclosure Document about the iLoveKickboxing.com franchise.

2. 2/24/2017, 20___ (Date) — DS BSA (Initials) — The date on which I signed the iLoveKickboxing.com Franchise Agreement (must be at least 14 days after the date in A.1).

3. 2/24/, 20 17 (Date) — DS BSA (Initials) — The earliest date on which I delivered cash, check or other consideration to an iLoveKickboxing.com franchise sales representative (must be at least 14 days after the date in A.1).

B. Representations:

1. No oral, written or visual claim or representation that contradicted or was not disclosed in the iLoveKickboxing.com Franchise Disclosure Document was made to me, except:

none — Initial: DS BSA

(If none, the franchisee must write none).

2. ILKB LLC made no oral, written or visual claim or representation that stated or suggested any financial performance, sales, income or profit levels to me, except:

none — Initial: DS BSA

(If none, the prospective franchisee must write none).

I/we certify the above is true and correct to the best of my/our knowledge.

Franchisee

By: DocuSigned by: Benjamin S. Alcid 5CFD45BF000E4EB... Date: 2/24/2017

By: ______________________ Date: ____________

## EXHIBIT 4 - ADDENDUM FOR MARYLAND FRANCHISEES

The Franchise Agreement is amended as follows:

1. Section 14.2(b) of the Franchise Agreement is amended to provide that a franchisee may sue in Maryland for claims arising under the Maryland Franchise Regulation and Disclosure Law. Any claim arising under the Maryland Franchise Registration and Disclosure Law must be brought within 3 years after the grant of the franchise.

2. All representations requiring prospective franchisees to assent to a release, estoppel or waiver of liability are not intended to nor shall they act as a release, estoppel or waiver of any liability incurred under the Maryland Franchise Registration and Disclosure Law.

3. Any general release required as a condition of renewal, sale and/or assignment/transfer shall not apply to any liability under the Maryland Franchise Registration and Disclosure Law.

4. ILKB has filed a surety bond in the amount of $120,000 with the Maryland Attorney General to insure ILKB performs its pre-opening obligations as franchisor under this franchise agreement and under the multi outlet agreement.

Date: 2/24/2017

FRANCHISEE:
BigDog NEST, Incorporated

BY: DocuSigned by: Benjamin S. Alcid 5CFD45BF000E4EB...

ITS: Benjamin S. Alcid

Date: 2/24/2017

FRANCHISOR:
ILKB LLC

BY: DocuSigned by: Scott Ferrari 592ACFCA2F9A405...

ITS: Scott Ferrari

**PRINCIPAL EQUITY OWNERS:**

______________________________

______________________________

______________________________

______________________________

______________________________

**ILKB LLC**
**ADDENDUM TO FRANCHISE AGREEMENT**

**THIS ADDENDUM** to the ILKB LLC Franchise Agreement (the "Addendum") is made and entered into on 2/24/2017 by and between ILKB LLC, a New York limited liability company with its principal office at 1844 Lansdowne Avenue, Merrick, New York 11566 (hereinafter "Franchisor", "ILKB", "we", "us", or "our") and Benjamin Alcid, an individual whose principal address is 910 Longbow Road, Mount Airy, Maryland 21771 (hereinafter "Franchisee", "you" or "your").

**WITNESSETH:**

WHEREAS, Franchisor and Franchisee (the "Parties") are signatories to a Franchise Agreement dated 2/24/2017 (the "Franchise Agreement") for the establishment and operation of a iLoveKixckboxing.com Outlet in the Territory of MD 20;

WHEREAS, Franchisee has requested, and Franchisor is willing, to amend the provisions of the Franchise Agreement in accordance with the terms set forth in this Addendum.

NOW, THEREFORE, the Parties, in consideration of the foregoing and of the undertakings and commitments of each party to the other set forth herein, hereby agree as follows:

1. Section 16.2 (a) is hereby deleted and replaced with the following:

   "16.2 (a) You and your Principal Equity Owners, jointly and severally, hereby agree to protect, defend and indemnify ILKB, and all of our past, present and future owners, affiliates, officers, directors, employees and designees, and each of them, from any liability or damage any of them may incur, including reasonable attorney's fees, as a result of third party claims demands, costs or judgments of every kind or nature arising out of your development, maintenance or operation of the Outlet and the Franchised Business in a manner not in compliance with the Operations Manual, except if caused by our intentional misfeasance, negligence or material default of our obligations under this Agreement."

2. The Franchise Agreement is hereby amended by adding the following new Section XIX:

"**XIX. Limitations and Exclusions**.

**<u>19.1</u>** **<u>Limitation of Liability.</u>** NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, EXCLUDING LIABILITIES ARISING FROM FRAUD, INTENTIONAL MISCONDUCT, OR AN INTENTIONAL BREACH OF THIS AGREEMENT,

(I) IN NO EVENT WILL YOUR AGGREGATE LIABILITY (INCLUDING, BUT NOT LIMITED TO, LIABILITY FOR NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT, MISREPRESENTATION AND OTHER CONTRACT OR TORT CLAIMS) ARISING FROM OR RELATED TO THIS AGREEMENT, EXCEED ONE-HUNDRED FIFTY THOUSAND DOLLARS ($150,000); AND

(II) IN NO EVENT WILL PRINCIPAL EQUITY OWNER'S AGGREGATE LIABILITY (INCLUDING, BUT NOT LIMITED TO, LIABILITY FOR

NEGLIGENCE, STRICT LIABILITY, BREACH OF CONTRACT, MISREPRESENTATION AND OTHER CONTRACT OR TORT CLAIMS) ARISING FROM OR RELATED TO THIS AGREEMENT, EXCEED FIFTY THOUSAND DOLLARS ($50,000).

**19.2** **Exclusion of Other Damages.** EXCEPT FOR LIABILITIES ARISING FROM FRAUD, INTENTIONAL MISCONDUCT, OR AN INTENTIONAL BREACH OF THIS AGREEMENT, IN NO EVENT WILL YOU OR THE PRINCIPAL EQUITY OWNER BE LIABLE TO US OR TO ANY THIRD PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL, DAMAGES (INCLUDING WITHOUT LIMITATION, LIABILITIES RELATED TO A LOSS OF USE, PROFITS, GOODWILL OR SAVINGS OR A LOSS OR DAMAGE TO ANY SYSTEMS, RECORDS OR DATA, WHETHER SUCH LIABILITY ARISES FROM ANY CLAIM BASED UPON CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE, EVEN IF ADVISED IN ADVANCE OR AWARE OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE."

**IN WITNESS WHEREOF**, the parties hereto have executed this Addendum under seal on the date first written above.

ILKB LLC

DocuSigned by:
Scott Ferrari
592ACFCA2F9A405...

By: ______________________
Name: Scott Ferrari
Title: Director of Franchise Development

______________________
Witness

FRANCHISEE:

DocuSigned by:
Benjamin S. Alcid
5CFD45BF000E4EB...

______________________
Benjamin Alcid

______________________
Witness